# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br>430 South Capitol Street SE<br>Washington, DC 20003; | |
| DEMOCRATIC GOVERNORS ASSOCIATION,<br>1225 Eye Street NW, Suite 1100<br>Washington, DC 20005; | |
| DSCC,<br>120 Maryland Avenue NE<br>Washington, DC 20002; | |
| DCCC,<br>430 South Capitol Street SE<br>Washington, DC 20003; | |
| U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER,<br>Notice of address to be filed under seal pursuant to LCvR 5.1(c); | |
| *and* | |
| U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES,<br>Notice of address to be filed under seal pursuant to LCvR 5.1(c); | CIV. NO. 1:25-cv-00952 |
| Plaintiffs,<br>*v.* | |
| DONALD J. TRUMP, in his official capacity as President of the United States,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500; | |
| EXECUTIVE OFFICE OF THE PRESIDENT,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500; | |
| U.S. ELECTION ASSISTANCE COMMISSION,<br>633 3rd Street NW, Suite 200<br>Washington, DC 20001; | |

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530;

U.S. DOGE SERVICE,
736 Jackson Place NW
Washington, DC 20503;

U.S. DEPARTMENT OF STATE,
2201 C Street NW
Washington, DC 20520;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

U.S. DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, DC 20301;

U.S. DEPARTMENT OF VETERANS AFFAIRS,
810 Vermont Avenue NW
Washington, DC 20420;

U.S. SMALL BUSINESS ADMINISTRATION,
409 Third Street SW
Washington, DC 20416;

U.S. DEPARTMENT OF THE INTERIOR,
1849 C Street NW
Washington, DC 20240;

SOCIAL SECURITY ADMINISTRATION,
6401 Security Boulevard
Baltimore, MD 21235;

BENJAMIN W. HOVLAND, in his official capacity as
Commissioner on the Election Assistance Commission,
633 3rd Street NW, Suite 200
Washington, DC 20001;

DONALD L. PALMER, in his official capacity as
Commissioner on the Election Assistance Commission,
633 3rd Street NW, Suite 200
Washington, DC 20001;

THOMAS HICKS, in his official capacity as
Commissioner on the Election Assistance Commission,
633 3rd Street NW, Suite 200
Washington, DC 20001;

CHRISTY MCCORMICK, in her official capacity as
Commissioner on the Election Assistance Commission,
633 3rd Street NW, Suite 200
Washington, DC 20001;

PAMELA BONDI, in her official capacity as
Commissioner on the Election Assistance Commission,
in her official capacity as U.S. Attorney General,
950 Pennsylvania Avenue NW
Washington, DC 20530;

AMY GLEASON, in her official capacity as Acting
DOGE Administrator,
736 Jackson Place NW
Washington, DC 20503;

MARCO RUBIO, in his official capacity as Secretary
of State,
2201 C Street NW
Washington, DC 20520;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE Washington,
DC 20528;

PETER B. HEGSETH, in his official capacity as
the Secretary of Defense,
1000 Defense Pentagon
Washington, DC 20301;

DOUGLAS A. COLLINS, in his official capacity
as Secretary of Veterans Affairs,
810 Vermont Avenue NW
Washington, DC 20420;

KELLY LOEFFLER, in her official capacity as

Administrator of the U.S. Small
Business Administration,
409 Third Street SW
Washington, DC 20416;

DOUG BURGUM, in his official capacity as
Secretary of the Interior,
1849 C Street NW
Washington, DC 20240;

*and*

LELAND DUDEK, in his official capacity as Acting
Commissioner of Social Security Administration,
6401 Security Boulevard
Baltimore, MD 21235;

        Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    In the United States of America, the President does not get to dictate the rules of our elections.

2.    The Framers of our federal Constitution foresaw that self-interested and self-aggrandizing leaders might seek to corrupt our democratic system of government to expand and preserve their own power. *See* The Federalist No. 51 (James Madison) ("If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary.").

3.    They therefore created a decentralized system of elections based upon separated powers divided among the leaders elected by—and closest to—the people. U.S. Const. arts. I, II, III. The Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations," meaning the States. The Federalist No. 59 (Alexander Hamilton). And it preserves for *Congress* the "power to alter [State] regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*"). This constitutional system—aided by many critical amendments that have expanded and safeguarded the right to vote—has stood the test of time, preserving American democracy for nearly a quarter millennium.

4.    But now the Framers' deliberate assignment of election-related powers and prerogatives is in peril. On March 25, 2025, President Trump signed an Executive Order—ironically entitled "*Preserving and Protecting the Integrity of American Elections*"—that asserts unprecedented authority for the President to dictate election rules on a host of topics. *See* Exhibit A (the "Executive Order" or the "Order"). *See generally* Exhibit A.

1

5.     The Executive Order seeks to impose radical changes on how Americans register to vote, cast a ballot, and participate in our democracy—all of which threaten to disenfranchise lawful voters and none of which is legal. The Order attacks dozens of States that have properly and lawfully adopted ballot receipt deadline laws that permit mail ballots *cast* by election day to count if *received* within a certain time frame, ignoring that such laws are longstanding and represent a legitimate "policy choice" by States. *DNC v. Wis. State Leg.*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring). The Order requires that the President's own design preferences be implemented on congressionally mandated voter registration forms, notwithstanding Congress's clear contrary commands, imposing unjustifiable burdens on all Americans—and especially servicemembers and their families, women, and lower-income voters—attempting to register to vote in federal elections. It forces numerous federal agencies to reveal sensitive personal information about millions of voters to the so-called Department of Government Efficiency ("DOGE") without any consent or statutory authority. It tramples upon the independence and bipartisan structure of the Election Assistance Commission ("EAC"), an agency created in the wake of the 2000 presidential election to improve election administration and voter access in coordination with States. And it wields federal dollars as a cudgel to force States to do the President's bidding to the detriment of their voters, threatening to deprive them of crucial grants to fund elections and law enforcement.

6.     Although the Order extensively reflects the President's personal grievances, conspiratorial beliefs, and election denialism, nowhere does it (nor could it) identify any legal authority he possesses to impose such sweeping changes upon how Americans vote.

7.     The reason why is clear: the President possesses no such authority. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal]

2

elections.'" *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023), *cert. denied,* 145 S. Ct. 545 (2024) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). The President lacks any "direct control" over the conduct of elections, *id.* at 1347, notwithstanding President Trump's unprecedented claim to the contrary.

8.     Because the Order does not "stem either from an act of Congress or from the Constitution itself," it is an unlawful exercise of authority that must be declared invalid. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Further still, the Order runs headlong into myriad laws and guarantees provided for by Congress, the States, and the Constitution—legal authorities that *do* regulate elections.

9.     Plaintiffs in this action—the Democratic National Committee, the Democratic Governors Association, the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee (collectively the "Party Plaintiffs"), and the Democratic leaders of the U.S. House and Senate—are severely harmed by the President's unlawful effort to upturn the electoral playing field in his favor and against his political rivals. And Plaintiffs' tens of millions of members and supporters are likewise injured by the Order's effort to make it harder to register to vote, to cast a ballot, and to administer fair elections. Plaintiffs therefore seek urgent equitable and declaratory relief from President Trump's unlawful Order.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal law claims, including claims arising under the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

11.     Venue is proper under 28 U.S.C. § 1391 because nearly all Defendants, including President Donald J. Trump, reside within this district and carry out their official duties within this district. Furthermore, a substantial part of the events giving rise to the claims occurred within this district, including the President's issuance of the Executive Order.

## PARTIES

12.     Plaintiff Democratic National Committee ("DNC") is the oldest continuing party committee in the United States and is the Democratic Party's national committee as defined by 52 U.S.C. § 30101(14). The DNC is dedicated to electing Democratic candidates in Federal, State, and local elections across the country. In support of its mission, the DNC seeks to register new voters as Democratic Party members and supporters; to preserve the lawful registration status of Democratic Party members and other Democratic Party supporters; to encourage and assist Democratic Party members and supporters in casting ballots and having those ballots count; to protect registered Democratic Party members and supporters from unlawful retaliation or intimidation; and to preserve the legal rights of its voters. Ken Martin serves as Chair of the DNC.

13.     Plaintiff Democratic Governors Association ("DGA") is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. Like the DNC, DGA works with Democratic gubernatorial candidates and campaigns to educate and communicate with Democratic voters; to support voter registration efforts and protect the registration status of currently registered party members and supporters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal voting rights of its voters. The DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices and policies, including for managing, administering, and budgeting for Federal, State, and local elections. Kansas Governor Laura Kelly

4

is the chair of the DGA. All incumbent Democratic governors currently serve as members of the DGA, representing 23 States, the District of Columbia, Guam, and the U.S. Virgin Islands. Several of these incumbent Democratic governors are also candidates for office in their respective States. Those DGA members are directly impacted by the Order in their individual capacities as candidates for office.

14.     Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee, as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. Like the DNC, DSCC's mission requires it to coordinate with Democratic Party Senate candidates to register new voters as Democratic Party members and supporters; to preserve the lawful registration status of Democratic Party members and other Democratic Party supporters; to encourage and assist Democratic Party members and supporters in casting ballots and having those ballots count; to protect registered Democratic Party members and supporters from unlawful retaliation or intimidation; and to preserve the legal rights of its voters. Kirsten Gillibrand, U.S. Senator from New York, serves as Chair of DSCC.

15.     Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. Like its fellow federal campaign committees, DCCC pursues its mission by working with Democratic Party congressional campaigns to register new party members and supporters; to protect the registration status of currently registered party members and supporters; to encourage and assist supporters of the Democratic Party in successfully casting

ballots; and to preserve the legal voting rights of its voters. Suzan DelBene, U.S. Representative from Washington's First Congressional District, serves as Chair of DCCC.

16.     Plaintiff Charles E. "Chuck" Schumer is the senior U.S. Senator from New York and the leader of the Senate Democratic Caucus, presently serving as Senate Minority Leader. As the leader of the Senate Democratic Caucus, Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Senate Democratic Caucus, as the caucus's ability to pass and influence legislation depends in significant part upon the size of its membership. Increasing the size of the Senate Democratic Caucus, both by electing new Democratic senators and reelecting incumbent Democratic senators, is therefore an essential part of Leader Schumer's mission and duties. Leader Schumer is often directly involved in campaigns across the country to elect Democratic senators, including in competitive battleground States. Relatedly, Leader Schumer works closely with DSCC and its leadership to help elect Democratic Senate candidates. Leader Schumer has been elected to the U.S. Senate five times and to the U.S. House of Representatives nine times prior to that. He is a candidate for the U.S. Senate in 2028. He is therefore also directly impacted by the Executive Order in his own capacity as a candidate for office.

17.     Plaintiff Hakeem S. Jeffries is a member of the U.S. House of Representatives from the Eighth Congressional District of New York. He is the leader of the House Democratic Caucus and presently serves as House Minority Leader. As the leader of the House Democratic Caucus, Leader Jeffries is responsible for helping to elect Democratic Party candidates in congressional elections across the country. This responsibility is critical to Leader Jeffries' ability to serve as an effective leader of the House Democratic Caucus, as increasing the size of the Caucus is central to improving its ability to pass and influence legislation, and its ability to pursue the mission and

platform of the Democratic Party. To that end, Leader Jeffries is directly involved in helping Democratic congressional candidates to campaign in races across the country, including in key battleground districts that often resolve which party controls the House of Representatives. He also works closely with DCCC and its leadership to help elect Democratic congressional candidates. Leader Jeffries has been elected seven times to the U.S. House of Representatives. He is up for reelection in the upcoming 2026 midterm elections. He is therefore also directly impacted by the Executive Order in his own capacity as a candidate for office.

18.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. The President carries out many of his duties through Defendant Executive Office of the President ("EOP"), an agency headquartered in Washington, D.C. On March 25, 2025, President Trump issued Executive Order 14248, *Preserving and Protecting the Integrity of American Elections*, which requires various federal officers, Executive Departments, and the U.S. Election Assistance Commission to adopt election rules and policies of his choosing.

19.     The U.S. Election Assistance Commission ("EAC") is a federal "independent entity" headquartered in Washington, D.C. *See* 52 U.S.C. § 20921. Defendants Benjamin W. Hovland, Donald L. Palmer, Thomas Hicks, and Christy McCormick are the Commissioners of the EAC. Each is sued in their official capacity.

20.     The U.S. Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C. Defendant Pamela Bondi is the U.S. Attorney General and is sued in her official capacity.

21.     The U.S. Department of Government Efficiency Service ("DOGE") is an agency within the EOP. *See* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). DOGE was, until

recently, known as the U.S. Digital Service. Defendant Amy Gleason is the Acting DOGE Administrator and is sued in her official capacity.

22.     The U.S. Department of State ("DOS") is a federal agency headquartered in Washington, D.C. Defendant Marco Rubio is the U.S. Secretary of State and is sued in his official capacity.

23.     The U.S. Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity.

24.     The U.S. Department of Defense ("DOD") is a federal agency headquartered in Washington, D.C. Certain States have designated DOD offices as federal voter registration agencies, as defined in 52 U.S.C. § 20506(a)(3)(B)(ii). Defendant Peter B. Hegseth is the Secretary of Defense and is sued in his official capacity.

25.     The U.S. Department of Veterans Affairs ("VA") is a federal agency headquartered in Washington, D.C. Certain States have designated VA offices as federal voter registration agencies, as defined in 52 U.S.C. § 20506(a)(3)(B)(ii). Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

26.     The U.S. Small Business Administration ("SBA") is a federal agency located in Washington, D.C. Certain States have designated SBA offices as federal voter registration agencies, as defined in 52 U.S.C. § 20506(a)(3)(B)(ii). Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.

27.     The U.S. Department of the Interior ("DOI") is a federal agency located in Washington, D.C. Certain States have designated DOI offices as federal voter registration

8

agencies, as defined in 52 U.S.C. § 20506(a)(3)(B)(ii). Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

28.     The Social Security Administration ("SSA") is a federal agency located in Baltimore, Maryland. Defendant Leland Dudek is the Acting Commissioner of SSA and is sued in his official capacity.

## STATEMENT OF LAW AND FACTS

**I.     The Constitution vests the power to regulate elections in the States and in Congress, not the President.**

29.     It is a bedrock principle that the President's power to issue executive orders "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

30.     Where the Constitution places authority in the hands of the Legislature rather than the Executive, the President may not "seiz[e] the power of the Legislature" by enacting policy "that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

31.     When the President "takes measures incompatible with the expressed or implied will of Congress," his authority is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). That includes when the President ignores congressionally established procedures and acts in "a different and inconsistent way of his own." *Id.* at 639.

32.     Though the Constitution extends to the Executive certain enumerated powers, the regulation of elections is not one of them. The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Meadows*, 88 F.4th at 1347.

9

33.     "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Meadows,* 88 F.4th at 1346 (quoting *Roudebush,* 405 U.S. at 24).

34.     The Elections Clause is at the core of this action. It provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." U.S. Const. art. I, § 4, cl. 1.

35.     As reflected by its text, the Elections Clause has two primary functions. First, it imposes upon the States the "duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators." *ITCA*, 570 U.S. at 8 (quoting U.S. Const. art. I, § 4, cl. 1). This gives States the authority and responsibility to enact and enforce laws governing elections, including as to federal elections. Second, the Clause expressly gives "the *Congress*" the "power to alter those regulations or supplant them altogether." *Id.* (emphasis added).

36.     As the Supreme Court has recognized, by "empower[ing] Congress" to "pre-empt state regulations governing the 'Times, Places and Manner' of holding congressional elections," the Elections Clause operates as the "Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Id.* (quoting U.S. Const. art. I, § 4, cl. 1).

37.     Thus, under the Clause's plain language, the broad discretion conferred on the States has just one narrow limitation: "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

38.     Outside of the Elections Clause, other provisions in the Constitution place certain requirements and limitations on the regulation of elections—but none allows the President to

override the will of the States or Congress in this space. For example, the Seventeenth Amendment requires that States hold elections for U.S. Senators, *see* U.S. Const. amend. XVII, and the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments prohibit abridging the right to vote based on sex, age, race, or poll tax, *see id.*, amends. XV, XIX, XXIV, XXVI. Likewise, constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments establish a federal constitutional right to vote free from excessive burdens. *See id.*, amends. I, XIV; *see, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

## II. Congress and the States have exercised their constitutional authority to enact laws that the Executive Order purports to displace.

39.    As relevant to this case, Congress has exercised its Elections Clause authority to (1) designate a federal election day; (2) establish the EAC to serve as an independent and bipartisan resource for election administration; and (3) create a federal voter registration form that prescribes certain information that voters must supply to register for federal elections. And, exercising that constitutional authority, States have enacted laws establishing mail ballot receipt deadlines and have administered their elections with the critical support of EAC grants. The President's unlawful Order represents an extraordinary intrusion on these congressional and State policy choices— choices the Constitution firmly assigns to them and not the Executive Branch.

### A. Congress has set a federal election day, while long and purposefully allowing States to establish their own mail ballot deadline rules.

40.    The Election Day Statutes—2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1—set the general election day for congressional races as "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," 2 U.S.C. § 7, and the presidential election as "the Tuesday next after

11

the first Monday in November, in every fourth year," 3 U.S.C. §§ 1, 21(1). Congress adopted the

Election Day Statutes "under the Elections Clause." *Foster v. Love*, 522 U.S. 67, 69 (1997).

41.    Prior to the adoption of the Election Day Statutes in the mid-nineteenth century,

States were free to hold elections for presidential electors and members of Congress at the time of

their choosing. Congress adopted a single federal election day "to remedy more than one evil

arising from the election of members of [C]ongress occurring at different times in the different

[S]tates." *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884). Specifically, "Congress was concerned

both with the distortion of the voting process threatened when the results of an early federal

election in one State can influence later voting in other States, and with the burden on citizens

forced to turn out on two different election days to make final selections of federal officers in

Presidential election years." *Foster*, 522 U.S. at 73. The Election Day Statutes thus set a clear date

by which voters must "make a final selection" of their choices for federal office. *Id.* at 71.

42.    Although Congress has prescribed a specific day by which voters must make their

"final selection," *id.*, States otherwise retain "wide discretion in the formulation of a system for

the choice by the people of representatives in Congress." *United States v. Classic*, 313 U.S. 299,

311 (1941). And the Election Day Statutes themselves give "no reason to think that simply because

Congress established a federal election day it displaced all State regulation of the times for holding

federal elections." *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001).

43.    Accordingly, many States, both presently and historically, have exercised their

discretion to adopt laws that permit mail or absentee ballots *cast* by election day to count if

*received* by election officials within a prescribed time. At present, nearly thirty States have such

laws, ensuring that the election results reflect the choices of the voters who participate in them, and do not exclude the votes of citizens who voted by mail on election day or well beforehand.[1]

44.    These laws are crucial to protecting the rights of voters to have their mail ballots counted, and they are particularly necessary to protect against the disenfranchisement of servicemembers, veterans, and older voters—who may have no choice but to vote by mail and are particularly susceptible to having their votes discarded due to stringent election-day receipt deadlines. To that end, roughly ten States have post-election mail ballot receipt deadlines that apply specifically for overseas and military voters.

45.    Post-election-day ballot receipt deadlines are not new; since the enactment of the Election Day Statutes, it has been common for States to enact such laws. *See e.g.*, Neb. Comp. Stat. §§ 2007, 2009, 2011, 2035 (1921) (counting ballots received before county canvassing board convenes, up to six days after election day); Cal. Pol. Code § 1360 (1923) (permitting receipt up to 14 days after election day); Kan. Stat. § 25-1106 (1929) (mailed by election day and received by ten days after); Mo. Rev. Stat. § 11474 (1939) (permitting receipt by day after election day);

---

[1] *See* Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081; Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05.(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Ind. Code § 3-12-1-17(b); Mass. Gen. Laws ch. 54 § 93; Md. Code Ann., Elec. Law, § 9-309; Maryland State Board of Elections, *Canvassing*, https://perma.cc/RZ8M-W6JK (last visited Mar. 31, 2025); Mich. Comp. Laws § 168.759a(18); Miss. Code Ann. § 23-15-637(1)(a); Mo. Rev. Stat. § 115.920(1); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code § 7-15-700(A); Tex. Elec. Code Ann. § 86.007(a)(2); Va. Code § 24.2-709(B); Wash. Rev. Code § 29A.40.091; W. Va. Code § 3-3-5(g)(2); *see also* Nat'l Conf. of State Legs., *Voting Outside the Polling Place Report, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (last updated March 24, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

1933 Wash. Sess. Laws Extraordinary Sess. at 102–03, ch. 41, § 5 (postmarked by election day and received by canvassing six days after).

46.     By 1942, with the United States' entry into World War II, post-election day receipt deadlines were common. *See Bill to Amend the Act of September 16, 1942: Hearing on H.R. 3436 Before the H. Comm. on Election of President, Vice President, and Representatives in Congress*, 78th Cong. 100, 102 (Oct. 26, 1943). At least nine States—California, Kansas, Maryland, Missouri, New York, Nebraska, Pennsylvania, Rhode Island, and Washington—had post-election ballot receipt deadlines, either for civilians, servicemembers, or both by 1943. *Id.* at 101; *see also* Neb. Rev. Stat. § 32-838 (1943) (permitting mail-in ballots to be received by up to two days after election day). By the mid-1980s, "[t]welve [States] ha[d] extended the deadline for the receipt of voted ballots to a specified number of days after the election." *Uniformed and Overseas Citizens Absentee Voting: Hearing on H.R. 4393*, 99th Cong. 21 (Feb. 6, 1986) (Statement of Henry Valentino, Director, Federal Voting Assistance Program). These laws make it possible for tens of millions of voters to have their ballots count, including in States like California where over 80 percent of voters voted by mail in the 2024 general election.

47.     "Despite these ballot receipt deadline statutes being in place for many years in many States, Congress has never stepped in and altered the rules." *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), *aff'd on other grounds,* 114 F.4th 634 (7th Cir. 2024). Congress was well aware of these practices. *See id*; 116 Cong. Rec. 6996 (1970) (Statement of Sen. Goldwater describing States that permit "absentee ballots of certain categories of their voters to be returned as late as the day of the election or even later."). And Congress has amended the Election Day Statutes several times without addressing ballot receipt deadlines—including most

recently in December 2022. *See* Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5233 (2022).

48.     Until President Trump's recent Order, the Executive Branch had consistently acknowledged that the Election Day Statutes do nothing to displace these state laws. *See, e.g.*, Br. of United States as Amicus Curiae at 6, *Bost v. Ill. State Bd. of Elections*, No. 23-2644 (7th Cir. Dec. 6, 2023) ("U.S. *Bost* Br.") ("Counting ballots after Election Day fully complies with the Federal Election Day Statutes if such ballots were mailed on or before Election Day."); Br. of United States as Amicus Curiae at 5, *RNC v. Wetzel*, No. 24-60395 (5th Cir. Sept. 10, 2024) (same). Indeed, it has stressed that any other reading of the Election Day Statutes would preclude the United States from seeking relief on behalf of military and overseas voters who do not receive absentee ballots in a timely fashion—a remedy the United States frequently seeks to protect members of the armed services from disenfranchisement. *See* U.S. *Bost* Br. at 23–28.

49.     Congress has affirmatively acknowledged in other federal statutes that ballot receipt deadlines are left up to the States. In 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), which requires States to allow military and overseas citizens to register and cast absentee ballots in federal elections. *See* 52 U.S.C. § 20301 *et seq.* UOCAVA provides that an alternative federal write-in ballot for military and overseas voters shall not count "if a State absentee ballot of the absent uniformed services voter or overseas voter is received by the appropriate State election official not later than the *deadline for receipt of the State absentee ballot under State law*." *Id.* § 20303(b)(3) (emphasis added). And in 2009, Congress passed the MOVE Act, which explicitly incorporates state-law ballot receipt deadlines into the federal statutory scheme by requiring officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered "to the appropriate election

officials" "not later than *the date by which an absentee ballot must be received in order to be counted in the election*." *Id.* § 20304(b)(1) (emphasis added); Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190.

50.    In short, Congress has repeatedly demonstrated its understanding that ballot receipt deadlines are a question of state, not federal law. As Justice Kavanaugh has explained, allowing absentee ballots to "be mailed by election day," and received by some state-law deadline thereafter is a longstanding "policy choice" reserved to the States. *DNC*, 141 S. Ct. at 34 (Kavanaugh, J., concurring). And more than a century of state practice has made clear that there is no "conflict between" the Election Day Statutes and such laws so "as to prevent their forming a harmonious system." *Millsaps*, 259 F.3d at 549 (quoting *Ex parte Siebold*, 100 U.S. at 386).

51.    Despite this longstanding practice in the States, the Republican Party has recently sought to invalidate these State laws based on the novel theory that the federal Election Day Statutes preempt *any* post-election ballot receipt deadline. To that end, Republicans in recent years filed lawsuits challenging post-election ballot receipt deadlines in Illinois, Mississippi, Nevada, New Jersey, and Pennsylvania. These efforts have overwhelmingly failed, with nearly every court rejecting such challenges for lack of standing, on the merits, or both. *See Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) (concluding Election Day Statutes are consistent with extended ballot receipt deadlines); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353–54 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) ("Federal law does not provide for when or how ballot counting occurs," and extended receipt deadlines and the Election Day Statutes "can, and indeed do, operate harmoniously."); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 369 (D.N.J. 2020) (rejecting the RNC's and others' challenges to New Jersey post-election mail ballot receipt deadline);  *Bost v.*

*Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (rejecting challenge to Illinois's 14-day ballot receipt deadline); *Republican Nat'l Comm. v. Wetzel*, 742 F. Supp. 3d 587, 601 (S.D. Miss.), *rev'd in part, vacated in part*, 120 F.4th 200 (5th Cir. 2024) (concluding Election Day Statutes are not violated "by allowing a reasonable interval for ballots cast and postmarked by election day to arrive by mail"); *Republican Nat'l Comm. v. Burgess*, No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (concluding Republican organizations and voters lacked standing to challenge Nevada's ballot receipt deadline); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) ("Congress did not intend 3 U.S.C. § 1 to impose irrational scheduling rules on state and local canvassing officials, and certainly did not intend to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.").[2] As these decisions show, the vast majority of courts have determined there is no conflict between the Election Day Statutes and longstanding state laws that provide for counting ballots cast on or before election day but received shortly after.

52.    Only a single court has held differently. The Fifth Circuit—breaking with all federal precedent on the issue—reversed a Mississippi district court's decision upholding Mississippi's ballot receipt deadline. The district court found "that case authority as well as the legislative history, combined with the Framers' intention in drafting the Elections and Electors Clauses, Supreme Court precedent, and Congress's enactment of UOCAVA support a finding that Mississippi's [ballot receipt] statute operates consistently with and does not conflict with the

---

[2] A Republican congressman has recently filed a similar lawsuit in California. *See Issa v. Weber*, 3:25-cv-598 (S.D. Cal., March 13, 2025).

Electors Clause or the election-day statutes." *Wetzel*, 742 F. Supp. 3d at 601 (Guirola, J.). The opinion reversing the district court rested almost entirely on a 1944 Montana state court decision concerning Montana law. *See Wetzel*, 120 F.4th at 206–09 (suggesting issue was "squarely within the holding of *Maddox v. Board of State Canvassers*, 116 Mont. 217, 149 P.2d 112 (1944)"). The panel's decision, by its own admission, ignored the actual meaning of the text within the Election Day Statutes, suggesting contemporary dictionary definitions "do not shed light" on the meaning of the laws, notwithstanding the Supreme Court's use of dictionaries in *Foster* to interpret the very same statutes. *See id.* at 206 n.5; *see also Foster*, 522 U.S. at 71 (citing N. Webster, An American Dictionary of the English Language 433 (C. Goodrich & N. Porter eds. 1869)). Five members of the Fifth Circuit voted to rehear the case *en banc*, noting that the "substantial, if not overwhelming, weight of authority—including dictionary definitions, federal and state caselaw, and legislative history—counsels against the preemptive interpretation that the panel adopted." *Republican Nat'l Comm. v. Wetzel*, No. 24-60395, 2025 WL 917346, at *3 (5th Cir. Mar. 14, 2025) (Graves, J., dissenting from denial of rehearing *en banc*); *see also id.* at *12 (Higginson, J., similar).

53.    Despite this lopsided precedent, President Trump's Order seeks to elevate one court's anomalous and incorrect decision in order to strike down laws in States that have exercised their sovereign and constitutional prerogative to help their residents vote, particularly those who live or serve overseas or who rely on mail voting to access the ballot box.

**B.    Congress established the Election Assistance Commission as an independent and bipartisan agency.**

54.    In 2002, Congress exercised its authority to enact the Help America Vote Act ("HAVA"), which created the EAC to further improve the administration of federal elections through funding, guidance, and policy development.

55.     Congress authorized the EAC to award, distribute, and monitor grant funds to help States meet HAVA's standards and improve election administration. For example, because meeting the election administration standards established by HAVA required significant investments for many States, Congress authorized the EAC to distribute annual "requirements payments" to help cover the costs. 52 U.S.C. §§ 21001-21008. The EAC is also authorized to fund grant programs to collect election data, *id.* § 20981, provide training relating to election assistance, *id.* § 20508(a), adopt voluntary voting system guidelines, *id.* § 20922, improve voting technology through research and pilot programs, *id.* §§ 21041–21043; 21051–21053, conduct voter education activities for students and their parents, *id.* §§ 21071–21072, encourage students and higher education institutions to serve as poll workers, *id.* §§ 21121–21123, and carry out research and development to improve the quality, reliability, accuracy, accessibility, affordability, and security of voting equipment, election systems, and voting technology, *id.* §§ 21041–21043.

56.     In 2018, Congress authorized the EAC to distribute election security grants to provide States with additional resources to improve the administration of elections for federal office, including to enhance technology and make certain election security improvements.[3] Since these funds were first appropriated in 2018, the EAC has disbursed over $1 billion in grants to state and local election jurisdictions.[4] This funding is critical for States; for example, the EAC

---

[3] Consolidated Appropriations Act of 2018, H.R. 1625, 115th Cong. (Mar. 23, 2018), https://www.congress.gov/115/plaws/publ141/PLAW-115publ141.pdf.

[4] Bipartisan Pol'y Ctr., *Measuring the Impact of Recent Grants to Election Administrators Under the Help America Vote Act* 2 (Dec. 2024), https://www.eac.gov/sites/default/files/2025-01/Election_Security_Grant_Report_Final_508.pdf.

funding Kansas received in 2020 made up over half of the Kansas Office of Secretary of State's budget for that fiscal year.[5]

57.     EAC grant funds have enabled election officials to perform essential functions, including protecting election systems from cyberattacks, modernizing voting systems, improving the accuracy of voter rolls, making sure polling places are accessible to all Americans, and auditing elections to ensure that the proper procedures were followed, and the outcomes were correct. Federal law also permits States to use these funds to make significant investments in voting equipment, including equipment to make mail voting more efficient, drop boxes for the collection of mail ballots, and other changes that make elections more secure and more accessible.[6]

58.     Given the imperative that the regulation and administration of federal elections be free from partisan bias or other political machinations, Congress expressly created the EAC as an "independent entity." 52 U.S.C. § 20921. As Senator McConnell, a sponsor of the act creating the EAC explained, a key principle behind the creation of the EAC was the "establishment of an independent, bipartisan commission appointed by the President to provide nonpartisan election assistance to the states." 147 Cong. Rec. S13681-02, 2001 WL 1628058, at *S13684 (Dec. 19, 2001) (statement of Senator McConnell); *see also* 148 Cong. Rec. S797-01, 2002 WL 225992,  at *S811 (Feb. 14, 2002) (similar from Senator Brownback).

59.     This independence is exemplified by the EAC's composition and quorum requirements. The EAC is led by four members who are appointed by the President with the

---

[5] Kan. Off. of the Governor, *The Governor's Budget Report: Vol. 1, Fiscal Year 2021* 83–84 (Jan. 16, 2020), https://budget.kansas.gov/wp-content/uploads/FY2021_GBR_Vol1-UPDATED_2-24-2020.pdf.

[6]  U.S. Election Assistance Comm'n, *HAVA Grants Frequently Asked Questions,* https://perma.cc/XJM7-3GGZ (last visited Mar. 30, 2025).

Senate's advice and consent, no more than two of whom may be affiliated with the same political party. 52 U.S.C. § 20923(a)–(b). Congress anticipated that recommendations from Republican congressional leaders would result in the nomination of two prospective Commissioners, and recommendations from Democratic congressional leaders would result in the nomination of the other two prospective Commissioners. *Id.* § 20923(a)(2). Each Commissioner is to have experience or expertise in election administration or the study of elections, and no Commissioner may engage in outside employment while serving on the EAC. *See id.* § 20923(a)(3), (d)(2).

60.    The EAC may act only with the approval of at least three of its members—that is, with the approval of members from at least two different political parties. *Id.* § 20928. Once the President appoints Commissioners, he plays no role in the EAC's decision-making.

61.    This careful design partitioning Commissioners' sensitive work from day-to-day interference by the President is consistent with nearly a century's worth of precedent. *See, e.g.*, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (affirming constitutionality of Federal Trade Commission's independence); *Wiener v. United States*, 357 U.S. 349 (1958) (same for War Claims Commission); *Consumers' Rsch. v. CPSC*, 91 F.4th 342 (5th Cir. 2024) (same for Consumer Product Safety Commission); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762 (10th Cir. 2024) (similar), *cert. denied*, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025). These decisions recognize Congress's authority to prescribe the independence of agencies led by a bipartisan, multimember body of experts—that is, of agencies structured precisely like the EAC.

**C.    Congress created the federal voter registration form with the National Voter Registration Act to make it easier for Americans to register to vote and participate in federal elections.**

62.    Congress has also exercised its authority to enact the National Voter Registration Act ("NVRA"), federal remedial legislation that streamlines the voter registration process and

provides for simplified and voter-friendly systems to register to vote throughout the country. *See generally* Pub. L. No. 103–31, 107 Stat. 77 (1993).

63.     In enacting the NVRA, Congress sought to "increase the number of eligible citizens who register to vote" by making it "possible for Federal, State, and local governments to implement [the law] in a manner that enhances the participation of eligible citizens as voters." 52 U.S.C. § 20501(b)(1)–(2). It also found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

64.     As part of the NVRA's scheme, Congress has required the EAC to "develop a mail voter registration application form for elections for Federal office" in consultation with State election officials. *Id.* § 20508(a)(2). This application is commonly known as the "National Mail Voter Registration Form"—or simply, the "Federal Form."

65.     The NVRA prescribes certain limits related to the development of the Federal Form as well as requirements for its use. Specifically, the NVRA states that the Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1).

66.     The NVRA further specifies what information is sufficient to establish a voter's "citizenship" when using the Federal Form: "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* § 20508(b)(2).

67.     States are required to "accept and use" the Federal Form "for the registration of voters in elections for Federal office." *Id.* § 20505(a)(1). The current Federal Form does not require

registrants to provide documentary proof of citizenship ("DPOC"). Thus, the Supreme Court has held that this provision does not permit States to require further DPOC from voters using the current Federal Form. *ITCA*, 570 U.S. at 15.

68.    The NVRA also requires each State to designate as voter registration agencies "all offices in the State that provide public assistance," and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." 52 U.S.C. § 20506(a). Those agencies must provide the Federal Form to *all* voters who receive their services, unless the voter declines to register to vote in writing. *Id.* § 20506(a)(4)(A); *id.* § 20506(a)(6)(A).

69.    It also permits States to designate "Federal . . . offices" as "voter registration agencies" with "the agreement of such offices." *Id.* § 20506(a)(3)(B)(ii). Many States, for example, have designated recruiting offices for the Armed Services as agencies that must distribute the Federal Form. *E.g.*, Iowa Code Ann. § 48A.19; 25 Pa. Cons. Stat. § 1325(a); Va. Code § 24.2-411.2(A)(3). Similarly, other States have designated SBA and VA facilities as voter registration agencies to promote access to registration.[7] Kansas and New Mexico have designated education facilities managed by the Bureau of Indian Affairs (a sub-agency of DOI), too.[8] These agencies, in addition to distributing the Federal Form to voters, must "accept[]" completed Federal Forms and transmit them "to the appropriate State election official" for processing. 52 U.S.C. § 20506(a)(4)(A)(iii).

---

[7] *See, e.g.*, Mich. Off. of the Governor, Exec. Directive No. 2024-3 (June 20, 2024), *Updating Michigan's List of Voter Registration Agencies*, https://www.michigan.gov/whitmer/-/media/Project/Websites/Whitmer/Documents/Exec-Directives/ED-20243-signed.pdf.

[8] *See Tribal College Opens Its First Voter Registration Office on Campus*, Native News Online (Oct. 3, 2023), https://perma.cc/FM3H-N2NM.

70.     The NVRA further regulates voter-roll maintenance at the state level with dual goals of protecting voters from improper or premature removal and maintaining accurate lists. To that end, the statute imposes strict restrictions on whether, when, and how States may remove a voter from their registration rolls. *See generally* 52 U.S.C. § 20507.

III.    **The Executive Order dictates sweeping changes to election laws across the country, without any grant of constitutional or statutory authority.**

71.     On March 25, President Trump issued Executive Order 14248, titled *Preserving and Protecting the Integrity of American Elections*. Without any authority, the Order decrees a centralized takeover of U.S. elections in which the President's policy preferences run roughshod over state laws and obstruct the flow of critical federal funds to any State that stands in the way. The relevant sections are discussed briefly below.

A.      **The Executive Order seeks to impose the President's policy preferences on States with extended ballot receipt deadlines, threatening mass disenfranchisement.**

72.     Nearly thirty States have laws that allow for the counting of ballots cast by a voter by election day and submitted in the mail by that date.

73.      These widely adopted laws have existed for at least a century, *supra* II.A, and are particularly necessary to prevent the disenfranchisement of voters—especially servicemembers, Americans living overseas, and older voters—who could otherwise be denied the right to vote because of mail delays beyond their control. These laws are especially needed now. Postal service delays have become commonplace, and as a result voters who mail their ballots well in advance of election day may find themselves disenfranchised through no fault of their own. These laws protect the rights of a significant number of voters; Nevada's two most populous counties, for

example, received more than 45,500 ballots after election day in 2022.[9]  And in Washington State, more than 250,000 ballots were postmarked on time but arrived after election day in 2024.[10]

74.    Section 7 of the Order makes the false claim that all of these state laws are invalid, and not in compliance "with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress." E.O. § 7(a). To that end, Section 7 requires the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." *Id.*

75.    The upshot of Section 7 is plain: It seeks to force States to abandon their own longstanding laws requiring counting of validly cast ballots that arrive after election day—laws that ensure voters are not disenfranchised by increasingly common mail delays—by also requiring the EAC to condition any federal funding to States on acquiescence to the President's dictate. *Id.* § 7(b).

76.    And though Section 7(b) half-heartedly attempts to carve out UOCAVA voters from the President's directive that the EAC withhold funding from States that refuse to set election day as a ballot receipt deadline, *see id.* (citing 52 U.S.C. 20301, *et seq.*), UOCAVA voters remain in the crosshairs. The President's Order is unambiguous in his belief that the Election Day Statutes require *all* ballots to be received by election day. *See* E.O. § 1 (accusing States of "fail[ing] to

---

[9] *See* Tabitha Mueller, *Are Tens of Thousands of Mail Ballots Received After Election Day in Nevada?*, The Nev. Indep. (May 10, 2024), https://perma.cc/B3ML-K6CT.

[10] *See* Wash. Sec'y of State, *Secretary of State Steve Hobbs' Statement Reacting to Presidential Executive Order on Elections* (Mar. 26, 2025), https://perma.cc/Y622-EMT9.

comply" with federal law "by counting ballots received after Election Day"); *see also id.* § 7(a) (listing no exception for UOCAVA voters). And nothing in any other federal law—including UOCAVA or the Election Day Statutes—creates an exception for UOCAVA voters. If President Trump is successful in forcing his reading of the Election Day Statutes onto the States, UOCAVA voters will be harmed every bit as much as other voters.

77.    The Order's imposition of an election day ballot receipt deadline finds no basis in any law passed by Congress, including the Election Day Statutes, which "are silent on methods of determining the timeliness of ballots," *Way*, 492 F. Supp. 3d at 372, and "operate harmoniously" with state laws establishing "post-Election Day absentee ballot receipt deadlines," *Bognet*, 980 F.3d at 354.

**B.    The Executive Order seeks to impose burdensome proof of citizenship requirements based on documents millions of Americans do not possess.**

78.    The Order also attempts to mandate new burdens on voters seeking to register to vote using the Federal Form. First, it directs the EAC to alter the Federal Form to require all voters to provide DPOC to register, allowing for only a narrow set of documents for this purpose—documents that millions of Americans do not possess. *See* E.O. § 2(a). Second, it requires state and local officials to indicate on the Federal Form the type of DPOC provided by the voter. *See id*. Third, it forces federal agencies designated to serve as voter registration agencies to "assess citizenship" for "enrollees of public assistance programs"—but no one else—before providing them the Federal Form, blatantly discriminating against the most vulnerable Americans. *See id.* § 2(d).

79.    Starting with the first mandate, the Order states that the EAC must "within 30 days" take "appropriate action to require, in its national mail voter registration form . . . documentary

26

proof of United States citizenship." E.O. § 2(a)(i). Only select documents qualify: (A) a U.S. passport; (B) a REAL ID or (C) an official military identification card, but only if those IDs "indicate[] the applicant is a citizen of the United Sates"; or (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or is accompanied by proof of U.S. Citizenship. *See id.* § 2(a)(ii). Several forms of identification listed in the Executive Order—including REAL IDs and military identification cards—do *not* necessarily establish a person's U.S. citizenship.[11] Only five States—Michigan, Minnesota, New York, Vermont, and Washington—offer "enhanced" driver's licenses that indicate citizenship, according to DHS.[12]

80.    Acceptable documentation to prove citizenship as mandated by the Order does ***not*** include as independent forms of proof: adoption certificates, Consular Reports of Birth Abroad issued by the Secretary of State, naturalization documents issued by DHS, American Indian Cards issued by DHS indicating citizenship, or even birth certificates.[13] *See* E.O. § 2(a)(ii).

81.    The Order imposes a similar DPOC requirement on overseas and military voters, requiring the Secretary of Defense to "update the Federal Post Card Application" used by military and overseas voters to require "documentary proof of United States citizenship" as well as "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id.* § 3(d).

---

[11] *See, e.g.*, Bay Area News Grp., *Can California's Real ID Be Used as Proof of U.S. Citizenship?*, Mercury News (Jan. 29, 2025),  https://perma.cc/DBB9-BVHJ; U.S. Embassy & Consulates in Japan, *Proof of U.S. Citizenship*, https://perma.cc/WU9M-4TQ8.

[12] Dep't of Homeland Sec., *Enhanced Drivers' Licenses: What Are They?* (last updated Apr. 27, 2023), https://perma.cc/5QUT-FELG.

[13] The President's exclusion of a valid birth certificate as documentary proof of citizenship coincides with Executive Order 14160, which contests the citizenship status of children born on American soil. *See* Exec. Order No. 14160, *Protecting the Meaning and Value of American Citizenship* (Jan. 20, 2025).

UOCAVA, however, does not permit or contemplate the addition of such requirements. *See* 52 U.S.C. § 20301(b)(2). And the Order fails to explain what qualifies as proof of voter eligibility in a particular State.

82.    In addition to directing the EAC to add a DPOC requirement to the Federal Form and DHS to add a similar requirement to the Federal Postcard Application, the Order also directs the EAC to amend the Federal Form to require "a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship" including the date, office, and other information about the voter's provision of citizenship proof. E.O. § 2(a)(i)(B).

83.    The Order cites no source of authority for the President to dictate the contents of the Federal Form. And federal law makes clear the EAC is responsible for promulgating that form—in its capacity as an "independent entity," 52 U.S.C. § 20921, that may act only "with the approval of at least three of its members," *id.* § 20928, "in consultation with the chief election officers of the States[.]" *Id.* § 20508(a)(2).

84.    The Order also imposes citizenship checks by federal agency officials for a discrete group of voters. It directs the "head of each Federal voter registration executive department or agency" to "assess citizenship" of "enrollees of public assistance programs" *prior to* providing them with federal voter registration forms. *See* E.O. § 2(d). Without any justification whatsoever, the provision singles out individuals receiving public assistance. Nowhere does the Order explain what it means for these officials to "assess" citizenship, how federal agencies should conduct this citizenship assessment, or how it can be done reliably. Nor does the Order explain why only those who receive public assistance should be subject to citizenship checks before they can be given the Federal Form. *See id.*

28

**C.      The Executive Order conditions election funding on States' compliance with the President's policy preferences.**

85.      In order to make States obey his preferred election policies, President Trump's unlawful Order repeatedly commands that various federal agencies withhold funding from States that do not adhere to certain provisions of the Order.

86.      As noted above, Section 7 of the Order requires the EAC to "condition any available funding to a State on that State's compliance with" the President's view that the federal Election Day Statutes require States to reject any ballots received after election day—even if the voter cast and mailed their ballot before then. None of the statutes authorizing the EAC to provide federal funding to States conditions disbursements on the adoption of any specific ballot receipt deadline.

87.      The Order also requires the EAC to discontinue federal funds to States that do not comply with the President's new proof of citizenship requirements. *See* E.O. § 4(a) (directing EAC to "take all appropriate action to cease providing Federal funds to States that do not comply with . . . any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order"). But no statute authorizes the EAC to condition funding to states on requiring DPOC with a voter's registration.

88.      Elsewhere the Order makes coercive threats to States to comply with other of its directives or else risk losing critical election funding. Section 4(d) orders the Secretary of Homeland Security and the Administrator of the Federal Emergency Management Agency to "heavily prioritize compliance with" the Executive Order's mandate that voting systems should provide a voter-verifiable paper record when providing funding for state or local elections. *Id.* § 4(d). Section 5(b) similarly directs the Attorney General to "review for potential withholding" grants and other funds the DOJ awards and distributes to state and local governments if any state

refuses to share information or cooperate in investigations and prosecutions of election crimes. *Id.* § 5(b)(ii).

**D. The Executive Order forces federal agencies to share sensitive voter information with DOGE and state officials.**

89. In addition to imposing unprecedented requirements on States and voters, several parts of the Executive Order direct federal agencies and officers to grant third parties unauthorized access to federal systems and databases containing the personal information of American citizens like Leader Schumer, Leader Jeffries, and tens of millions of other members, constituents, and supporters of the Party Plaintiffs.

90. For example, the Order directs the Department of Homeland Security to grant the "DOGE Administrator" access to, among other things, "Federal immigration databases" as part of efforts to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities." E.O. § 2(b)(iii).

91. The Order directs the Secretary of Homeland Security to "ensure that State and local officials have . . . access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." *Id.* § 2(b)(i).

92. The Order directs the Secretary of State to "make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered." *Id.* § 2(b)(ii).

93. And the Order directs the "Commissioner of Social Security [to] take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local

election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered." *Id.* § 3(a).

94.    The Order's directives are precisely the sort of broad, inter-agency dissemination of identifying information that Congress prohibited when it enacted the Privacy Act. *See* 5 U.S.C. § 552a (prohibiting agencies from disclosing "any record" containing an individual's identifying information to any other person or agency without prior written consent of the individual).

### E.    The Order dismantles the EAC's independence.

95.    As the EAC's organic statute makes clear, Congress intended for the agency to be an "independent entity." 52 U.S.C. § 20921. To that end, it crafted the EAC to have certain structural design features to ensure its bipartisanship and independence. *See id.* § 20923.

96.    President Trump's Order shreds this congressional design. Most notably, it dictates *to* the EAC what changes it must make to the Federal Form, ignoring Congress's command that the EAC promulgate the form based on its own expertise and "in consultation with the chief election officers of the States." *Id.* § 20508(a)(2). Although the NVRA permits "a State [to] request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," *ITCA*, 570 U.S. at 19, nowhere does it permit the *President* to simply design the Federal Form as he wishes.

97.    Similarly, the Order instructs the EAC to "initiate appropriate action to amend" its existing Voluntary Voting System Guidelines 2.0, which provide best practices for States to follow for voting systems and ballot design. E.O. § 4(b)(i). The Guidelines are critical for providing States

with reliable guidance on a host of issues, including data privacy, cybersecurity, ballot secrecy, and accessibility to those with disabilities.[14]

98.     Far from leaving it to the EAC's expertise to craft these critical guidelines, however, President Trump has already decided how they should be amended: the EAC "shall provide" that voting systems "should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities, and should provide a voter-verifiable paper record to prevent fraud or mistake." E.O. § 4(b)(i).

99.     The President thus claims that he may substitute his own views—rooted in conspiracy and falsehoods about elections—for the expertise of the agency. And he, in turn, has ordered other federal agencies—including DHS and FEMA—to "prioritize" compliance with these new guidelines in providing funding to State and local election officials. *Id*. § 4(d).

100.     Along the same lines, without offering explanation as to why the EAC's prior standards were deficient, the Order also requires the EAC to "rescind all previous certifications of voting equipment based on prior standards," and "re-certify voting systems" under standards established by the Order. *Id.* § 4(b)(ii). It then requires the EAC to "report any discrepancies or issues with an audited State's certifications of compliance with Federal law to the Department of Justice for appropriate enforcement action." *Id.* § 4(c).

101.     In other words, President Trump seeks to weaponize the EAC to punish States that do not bend to his own fevered beliefs about voting machines.

---

[14] *See generally* U.S. Election Assistance Comm'n Technical Guidelines Dev. Comm., *Voluntary Voting System Guidelines VVSG 2.0* (Feb. 10, 2021), https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf.

IV.    **The Executive Order severely harms Plaintiffs, members and supporters of the Party Plaintiffs, and lawful, eligible voters by making it harder to register, vote, and hold fair elections.**

102.    In view of its extraordinary breadth and unprecedented nature, the Executive Order harms Plaintiffs, the Party Plaintiffs' members and supporters, and the voters Plaintiffs represent. These injuries are not mere idle concerns for a future day—they come on the cusp of at least three special congressional elections and two gubernatorial elections in the coming months, and while each Plaintiff is actively planning, preparing, budgeting, and strategizing for the critical 2026 midterm elections—a campaign cycle that is already well underway.

A.    **Plaintiffs and their members and supporters are harmed by the Order's efforts to impose an unlawful national election day ballot receipt deadline.**

103.    *First*, the President's invented election day ballot receipt deadline harms each Plaintiff by undermining their efforts to enfranchise voters through their mail-voting programs and by threatening their ability to compete in upcoming elections.

104.    The Party Plaintiffs have for many years invested heavily in encouraging their members and supporters to vote by mail—and, in doing so, have developed increasingly comprehensive outreach, assistance, and ballot-cure programs that ensure their voters are able to cast mail ballots and have them counted. The Party Plaintiffs have already begun to plan for and intend to execute similar programs in upcoming elections. These programs are built on the premise that voters' ballots will be counted if they are returned to the election office *or* the Postal Service by election day—except in States that have enacted a different rule.[15]

105.    President Trump's imposition of a national election day ballot receipt deadline will also directly disenfranchise Plaintiffs' members and supporters by forcing States to toss out ballots

---

[15] *See supra* ¶¶ 43–47 (describing state practices regarding mail ballot deadlines).

not received by election day, even where state law provides a longer period for receipt. This harm will be particularly acute to Plaintiffs' members and supporters in States where voting by mail is the norm. Indeed, voting by mail is the most common means of voting in many States—and some States now automatically send mail ballots to *all* registered voters. *See, e.g.*, Nev. Rev. Stat. § 293.269911; Cal. Elec. Code § 3000.5.

106.    To avoid and counteract the disenfranchisement of such voters in upcoming elections, the Party Plaintiffs will be forced to redirect limited resources towards new programs. Planning for the 2026 election cycle is already well underway, and the Party Plaintiffs will have to restructure their longstanding mail-voter programs to account for the President's unlawful usurpation of state ballot receipt deadlines. Specifically, the Party Plaintiffs will replace their existing mail-voter assistance and outreach programs with programs aimed at ensuring their voters return their ballots by election day. The Postal Service and state officials typically advise voters to build in seven days or more for a ballot to be delivered—and even that window often is not sufficient. Given that harsh reality, the Party Plaintiffs will need to develop new voter education programs, including but not limited to social media campaigns and direct outreach aimed at encouraging voters to return their ballots far sooner than they have in the past, and without the benefit of a clear election day deadline for placing their ballots in the mail. The Party Plaintiffs will further be forced to engage in additional voter education and engagement programming to encourage voters to use other methods of voting to minimize the risk of disenfranchisement. These programs, which will need to be implemented in dozens of States, *supra* ¶ 43, come at significant economic cost.

107.    The President's self-created national election day ballot receipt deadline further harms Plaintiffs' competitive interests in upcoming elections because it—by purposeful design—

34

disproportionately harms Plaintiffs' members and supporters. Democratic voters use mail ballots at higher rates than their Republican counterparts in many States.[16] This harm is particularly acute for Democratic candidates in New York, including Leader Schumer and Leader Jeffries because, as of last year, all New Yorkers are authorized to vote by mail. Data also consistently shows that the voters whose ballots are rejected due to receipt past the deadline are disproportionately those from groups of citizens who tend to be registered Democrats. And if there was any doubt as to the intended effect of the Order, President Trump has frequently and vocally attacked voting by mail and his belief that it helps Democratic candidates win elections.

108.    Courts have routinely held that any threat to the electoral prospects of a political party's candidates stemming from a change in election rules constitutes a concrete and particularized injury for purposes of Article III.[17] Courts have also extended the same reasoning regarding harm to the electoral prospects of a party to the standing of individual candidates.[18] Plaintiffs thus have direct standing to challenge the Order on these grounds. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up). Moreover, when fewer Democrats hold elected office, the Party

---

[16] Pew Rsch. Ctr., *Voters' and Nonvoters' Experiences With the 2024 Election* (Dec. 4, 2024), https://perma.cc/BXR3-L2GJ (showing that in the 2024 general election 44 percent of Democratic candidates' voters voted by mail or absentee ballot compared to 26 percent of Republican candidates' voters).

[17] *E.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (regulations that "make[] the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation[s] were declared unlawful" inflict cognizable harm); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (similar, collecting "[v]oluminous persuasive authority").

[18] *E.g.*, *Nelson v. Warner*, 472 F. Supp. 3d 297, 306–07 (S.D. W. Va. 2020) (collecting cases from "[s]everal circuits" finding individual candidate and party committee standing).

Plaintiffs necessarily raise and receive less money—inflicting further pecuniary harm and limiting their resources.

109.     In short, by restructuring mail voting rules to benefit their competitors, Section 7 of the Order inflicts a variety of injuries on the Party Plaintiffs, their members, and their constituents, as well as Leader Schumer and Leader Jeffries.

**B.     Plaintiffs and their members and supporters are harmed by the Order's imposition of a DPOC requirement for the Federal Form and UOCAVA postcard application.**

110.     *Second*, the Executive Order's imposition of new proof of citizenship requirements injures Plaintiffs because it will make it more difficult for Plaintiffs to successfully register qualified citizen voters—many of whom do not have or will be unable to produce an acceptable form of documentation to satisfy the Order's demands—and harm their ability to compete in upcoming elections.

111.     Each of the Party Plaintiffs has invested in programs to ensure voters are able to register to vote and maintain their registrations. These programs encourage the Party Plaintiffs' members and supporters to register to vote in the most accessible way and support them in doing so. For many of the voters Plaintiffs represent, the best option is the Federal Form or, for military and overseas voters, the Federal Post Card. That is because, consistent with Congress's design, these methods have streamlined the registration process. *Supra* ¶¶ 62–67, 111. In addition to making it harder for Plaintiffs' members and supporters to register and remain registered to vote, the DPOC requirements force the Party Plaintiffs to divert resources away from other critical priorities in order to provide additional assistance to voters attempting to comply or complete a different means of registering.

112.    The DPOC requirement likewise threatens the Party Plaintiffs' ability to compete in upcoming elections. Millions of American citizens lack qualifying DPOC altogether and, as a result, will be unable to register and reregister to vote using the Federal Form or Federal Post Card. Indeed, when States have attempted to impose less restrictive DPOC laws, large numbers of citizens have found themselves unable to successfully register to vote. *See Fish v. Schwab*, 957 F.3d 1105, 1127–29 (10th Cir. 2020).[19]

113.    Plaintiffs are particularly likely to be severely harmed as a result, because groups that are more likely to support Democrats, including low-income individuals, enrollees of public assistance programs, and women will be disproportionately affected by the DPOC requirement. For instance, low-income voters lack qualifying citizenship documents and the ability to obtain them at far greater rates than more affluent individuals.[20] And the Order even singles out recipients of public assistance for additional citizenship "assess[ments]" before even receiving a Federal Form. *See* E.O. § 2(d). Additionally, nearly 80 percent of women change their last name upon marriage, so their legal name often does not match their citizenship documents.[21] Research shows that these voters, who are at substantial risk of disenfranchisement by the Order's DPOC

---

[19] *See also* Holly Raimer *et al.*, *N.H. Town Elections Offer a Preview of Citizenship Voting Rules Being Considered Nationwide*, Associated Press (Mar. 11, 2025), https://perma.cc/8TH4-SCB4 (noting that "[v]oting rights groups are particularly concerned that married women who have changed their names will encounter trouble when trying to register" because their citizenship documents do not match their legal name and "[t]hat is exactly what happened" in New Hampshire's recent town elections).

[20] *See, e.g.*, Gov. Accountability Off., No. GAO-07-889 (2007), *Medicaid: States Reported That Citizenship Documentation Requirement Resulted in Enrollment Declines for Eligible Citizens and Posed Administrative Burdens*, https://perma.cc/5VWA-A9J5.

[21] Pew Rsch. Ctr., *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name* (Sept. 7, 2023), https://perma.cc/UU7C-6KQD.

requirement, are consistently more likely to support Democratic candidates.[22] Accordingly, the Order imposes an actionable competitive injury on Plaintiffs.

114.    In sum, the Order's various proof of citizenship commands, including those in Sections 2, 3, and 4 of the Order, harm Plaintiffs and their members, constituents, and supporters by making it more difficult for them to register to vote and by undermining Plaintiffs' core voter registration and engagement efforts.

### C.    Plaintiffs and their members and supporters are harmed by the Order's withholding of funds to States.

115.    *Third*, the Order mandates that the EAC withhold critical election funding from States that do not capitulate to the President's policy preferences, which also inflicts direct organizational and competitive harm on the Party Plaintiffs. As explained, these funds make up significant portions of state election budgets. *Supra* ¶¶ 55–57. The grants have, for decades, supported essential election functions such as election security upgrades, election-official staffing improvements, voter outreach supplies, improvements in absentee voting equipment processes, and more.[23] And they have permitted States to fund discretionary early vote and drop box programs that are likely to lose funding absent federal support.

116.    The Party Plaintiffs and the voters they represent will suffer if the States they compete in lose critical election funding. Courts have recognized the unique role political parties play and the equally unique stakes they have in election administration: because the parties are the

---

[22] Pew Rsch. Ctr., *Party Affiliation of U.S. Voters by Gender, Orientation, Marital Status* (Apr. 9, 2024), https://perma.cc/YY9B-H7TS; Pew Rsch. Ctr., *Party Affiliation of U.S. Voters by Family Income, Home Ownership, Union Membership and Veteran Status* (Apr. 9, 2024), https://perma.cc/RLA6-YDUM.

[23] EAC, *HAVA Grants Frequently Asked Questions*, *supra* n.6.

entities that nominate the "individual[s] who will swear an oath . . . to the Constitution, and [who will have] the responsibility to represent all the residents" in their jurisdiction if successful, parties have both legal and practical responsibilities to uphold fair election processes, even as they compete for victory. *Utah Republican Party v. Cox*, 892 F.3d 1066, 1078 (10th Cir. 2018); *cf. N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202–03 (2008) (recognizing that States give parties, unlike other entities, a direct "role in the election process").[24]

117.    In other words, standing idly by as harm befalls States' election infrastructure, along with the voters Plaintiffs serve, is simply not an option. To protect their voters and their own electoral interests from the Order's threat to critical election funding, the Party Plaintiffs will be forced to spend resources to perform election-related functions that States typically perform. And because citizens who are more likely to vote for Democrats rely more heavily on absentee voting, the threats to state funding will come down hardest on Democrats, making it more difficult for them to compete as effectively.

118.    The threatened consequences of non-compliance here are particularly perverse. On the one hand, while States that capitulate to the President's whims may retain certain funding, their voters (and Plaintiffs) will suffer from the States' acquiescence to the President's preferred anti-voter measures. On the other hand, States that stand up for their sovereign and constitutional rights will face ruinous loss of funding that will cripple Plaintiffs' electoral process and force Plaintiffs to stem the breach to ensure they are able to compete fairly.

---

[24] *See also Cox*, 892 F.3d at 1078 (explaining that when assessing a political party committee's interests, "courts must engage in direct, functional analysis of the role of parties . . . in American democracy" and that this "analysis is not furthered by reasoning analogically [to other] civil-society entities" or nonprofits but instead should focus on the unique role parties play in election apparatuses (quoting Richard H. Pildes, *The Constitutionalization of Democratic Politics*, 118 Harv. L. Rev. 28, 107, 107 n.323 (2004))).

119.    Plaintiffs are therefore injured by the Order's unlawful mandates to withhold funding from States, including those in Sections 4, 5, and 7.

D.    **The Order's data-sharing provisions violate the privacy rights of Plaintiffs and their members and supporters.**

120.    *Fourth*, the Executive Order's requirement that federal agencies and officers grant third parties unauthorized access to federal systems and databases containing personal information of citizens harms Plaintiffs' members and supporters, as well as Leader Schumer and Leader Jeffries, all of whom are among those whose information will now be accessible to DOGE and state officials who are not authorized to access that information under federal law.

121.    The provisions also create a significant and imminent risk that Plaintiffs' members and supporters will be subject to unlawful investigations and possible removal from the voter rolls based on false suspicion of not being U.S. citizens. *See* E.O. § 2(b).

122.    The unauthorized disclosures will injure individuals with a Social Security number, which includes millions of Democratic voters across the country, in addition to Leader Schumer and Leader Jeffries, because that private identifier will now be shared without their consent to state and local officials. *Id.* § 3(a). Indeed, by requiring the transmission of information in "any other Federal databases containing relevant information," *id.*, every tax return, benefit application, or federal health record is within the reach of local officials who may claim that the information is relevant to reviewing a registrant's residency or other voting qualifications.

123.    Disclosure of such information alone constitutes significant injuries to the well-established privacy interests of Plaintiffs and their members and supporters. *See, e.g., Garey v. James S. Farrin*, 35 F.4th 917, 919–20 (4th Cir. 2022); *see also Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) ("[C]onduct giving rise to unauthorized viewing of

personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person . . . .").

124.    But these serious privacy violations risk even further harms to the Party Plaintiffs and their members and supporters—they increase the likelihood that Democratic Party members and supporters will have their state voter registration status reviewed based on outdated or not-fit-for-purpose federal data, leading to the improper removal of qualified voters from the rolls. The Order is clear that the unlawful disclosures are being made for the purpose of investigating and taking further action against voters whom Defendants think might not be eligible, including voters who are already registered (and thus already proved their qualifications). Yet matching information contained in federal databases to voter registration data is an extremely error-prone endeavor for several reasons, not the least because federal databases are often not "up to date." *E.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 705 (9th Cir. 2025). The risk of erroneous identification, investigation, and improper removal from voter rolls by state officials only compounds the harm resulting from unlawful disclosure of registration applications based on local officials' review of data provided by federal agencies. *See id.* at 708 ("The danger to voting rights here is that properly registered voters, who in fact are citizens, may have their voter registrations cancelled upon mere and potentially arbitrary suspicion of a county recorder, losing their constitutional right to vote."). Furthermore, by demanding that agencies like DOGE cross-reference federal data with state voting lists, the Order increases the likelihood that Democratic Party members and supporters will be improperly targeted for harassment or retaliation based on false suspicions that they are not qualified to vote.

125.    The mandates that federal officers disclose private information located in federal databases—including those located in Sections 2 and 3 of the Order—injure Plaintiffs' members

and supporters directly, as well as the Party Plaintiffs by making it more difficult to register new voters and to maintain the registrations of existing voters.

## CLAIMS FOR RELIEF

### COUNT I

#### *Ultra Vires* Presidential Action
#### (All Defendants)

126.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

127.    "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) ("*NFIB*"). Accordingly, it is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quotation omitted); *see Youngstown*, 343 U.S. at 585. The President lacks *any* authority to act "unconstitutionally *or* beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n. 11 (1949)). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied,* 144 S. Ct. 1110 (2024).

128.    In the realm of elections for federal, state, and local office, the President's constitutional and statutory authority is purposefully limited. The Constitution itself grants the President no direct authority over elections. Instead, the Constitution "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69 (citing U.S.

Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. 2, § 1, cl. 2. As Alexander Hamilton explained, the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations." The Federalist No. 59 (Alexander Hamilton).

129.    To be sure, the Federal government has authority to displace certain state laws governing elections. But the Constitution makes clear that it only "empowers *Congress* to pre-empt state regulations governing" federal elections, not the President. *ITCA*, 570 U.S. at 8 (emphasis added). It is only "the action of *Congress*," not the President, that may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. at 384 (emphasis added). Even then, Congress's authority goes only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Siebold*, 100 U.S. at 371).

130.    In contrast to Congress's express authority to regulate elections, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* (quoting *Roudebush,* 405 U.S. at 24). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.* at 1347. Instead, the President and other executive officers may only act "in relation to another branch's constitutionally-authorized act." *Id.* "Perhaps tellingly, in the field of election administration, Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

131.    President Trump's Order dramatically exceeds his highly limited constitutional and statutory authority when it comes to regulating elections. His Order identifies no source of legal authority—and none exists—for the President to:

- Require the EAC to "take appropriate action" to add the President's preferred DPOC requirements to the federal voter registration form, E.O. § 2(a)(i), which federal law makes clear the EAC is responsible for promulgating—in its capacity as an independent agency—"in consultation with the chief election officers of the States," 52 U.S.C. § 20508(a)(2);

- Command "State or local officials[s]," either directly or via the EAC, to record the type of DPOC used to complete the Federal Form, E.O. § 2(a)(i)(B);

- Require DHS or authorize DOGE to supervise how States maintain their voter registration lists under the NVRA, including by instructing those agencies to subpoena State records, *id.* § 2(b)(iii);

- Compel the heads of Federal voter registration agencies to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs," *id.* § 2(d).

- Command the EAC to:

  o "cease providing Federal funds to States" based on whether a State is willing to acquiesce to the President's demand that they reject timely-cast ballots that are received after election day in accordance with state law, *id.* § 4(a);

  o amend its Voluntary Voting System Guidelines 2.0, *id.* § 4(b)(i);

  o "re-certify voting systems" under standards established by the Order, *id.* § 4(b)(ii); and

  o "report any discrepancies or issues with an audited State's certifications of compliance with Federal law to the Department of Justice for appropriate enforcement action," *id.* § 4(c).

- Require the Attorney General and Department of Justice to "take all necessary action to enforce" the Election Day Statutes based on the President's preferred and flawed reading of those statutes, *id.* § 7(a); or

- Force the EAC to "condition any available funding to a State on that State's compliance" with the President's preferred and flawed reading of the Election Day Statutes, *id.* § 7(b).

132.    Each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them. And each command injures Plaintiffs, their

members, and supporters by making it more difficult to register voters who wish to become Democratic Party members; to maintain the registrations of existing Democratic Party voters; to permit Democratic Party members and supporters to successfully cast ballots, including by mail; and to elect Democratic Party candidates in fairly administered elections.

133.    Accordingly, this Court must "reestablish the limits on [the President's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States,* 828 F.2d 217, 224 (D.C. Cir. 1988)), by issuing injunctive and declaratory relief against each provision of the Executive Order identified above, *see also Larson*, 337 U.S. at 689.

## COUNT II

**Violation of the Separation of Powers – Unlawful Intrusion Upon Congressional Authority (Defendants Trump, Hovland, Palmer, Hicks, McCormick, EOP, EAC)**

134.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

135.    The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as well," including by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id.* at 222–23.

136.    President Trump's Order intrudes upon Congress's prerogatives in several respects, including its command that the EAC shall be "an independent entity," 52 U.S.C. § 20921, that may only act "with the approval of at least three of its members," *id.* § 20928; *see also League of Women Voters of U.S. v. Newby*, 963 F.3d 130, 133 (D.C. Cir. 2020) (explaining EAC is a "four-member independent commission"). Moreover, with respect to the Federal Form, Congress requires that the EAC design the form through its own independent judgment, in a bipartisan

45

manner, 52 U.S.C. § 20923(a)-(b), based on its commissioners' "experience with or expertise in election administration," 52 U.S.C. § 20923(c), and "in consultation with the chief election officers of the States," *id*. § 20508. Nowhere did Congress authorize the President to dictate the contents of the Federal Form *to* the EAC.

137. The Order, like President Trump's recent Executive Order 14215,[25] overrides the EAC's independent, bipartisan, and majority-based decision-making procedures—as required by Congress—to dictate that the agency take certain actions, including:

- Amending the Federal Form to include a DPOC requirement, E.O. § 2(a)(i);

- Ceasing to provide Federal funds to States that do not acquiesce to the President's imposition of a DPOC requirement, *id*. § 4(a);

- Amending guidance regarding standards for voting systems and to re-certify voting systems under such guidance, *id*. § 4(b);

- Reporting alleged discrepancies in any State's certifications of compliance with federal law as interpreted by the President to the Department of Justice, *id*. § 4(c); and

- Conditioning funding available to States based on their compliance with the President's preferred and flawed interpretation of the Election Day Statutes, *id*. § 7(b).

138. Notwithstanding these edicts, "Congress delegated to the EAC the decision of how" to promulgate the Federal Form and how to develop guidance on best practices for the States. *Gonzalez v. Arizona*, 677 F.3d 383, 403 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. at 1; *see also* 52 U.S.C. §§ 20921–20923, 20928–20929. And "the Elections Clause gives Congress the last word on how" the EAC shall carry out its congressionally mandated duties. *Gonzalez*, 677 F.3d at 403.

---

[25] *See* Exec. Order No. 14215, *Ensuring Accountability for All Agencies* (Feb. 18, 2025),https://perma.cc/7TNT-UX2B.

139.    The President's Order unlawfully intrudes upon Congress's design. *See, e.g.*, *Consumers' Rsch.*, 91 F.4th at 352 (rejecting challenge to Congress's creation of an independent agency led by a commission designed to achieve partisan balance), *cert. denied*, 145 S. Ct. 414 (2024).

140.    Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles"). And each of these violations of the separation of powers harms Plaintiffs by restricting how Plaintiffs, their members, and their supporters can register to vote and cast a ballot, as well as corrupting the EAC's independent decision-making processes in a manner intended to tilt the electoral playing field.

141.    Consistent with the Supreme Court's practice, the proper remedy is to enjoin operation of those portions of E.O. 14248 that offend the separation of powers, consistent with the Order's severability clause. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 734 (1986); *Seila L. LLC v. CFPB*, 591 U.S. 197, 212, 233–34 (2020); *see also* E.O. § 10 (severability provision).

## COUNT III

### Violation of the Separation of Powers – Unlawful Intrusion Upon State Authority
### (U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend X)
### (Defendants Trump, Bondi, EOP, DOJ)

142.    In addition to this "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers between

47

the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th

Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's

reservation "to the States" of all "powers not delegated to the United States by the Constitution,

nor prohibited by it to the States." U.S. Const. amend. X. It is further reflected in the Constitution's

express reservation of certain rights to the States, at least where Congress has not acted in a

contrary manner. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

143.    The Order violates the vertical separation of powers between the federal

government and the States by requiring executive officials to take actions that intrude upon matters

the Constitution leaves to the States, and where Congress has taken no contrary action. Most

notably, the Order requires the Attorney General to preempt and invalidate duly enacted laws in

States across the country providing that ballots cast by election day shall count if received within

a period of time determined by state law. See E.O. § 7(a).

144.    This section orders the Attorney General to "take all necessary action to enforce 2

U.S.C. 7 and 3 U.S.C. 1," but neither of these federal statutes speak to when a timely cast ballot

must be received in order to count, as nearly every court to confront the issue has held. *See, e.g.,*

*Bognet*, 980 F.3d at 353–54; *Way*, 492 F. Supp. 3d at 369; *Bost*, 684 F. Supp. 3d at 735; *Harris*,

122 F. Supp. 2d at 1325 (recognizing some States "allow post-election-day acceptance of absentee

ballots" and concluding "Congress did not intend  3 U.S.C. § 1" to preclude such laws); *Pa.*

*Democratic Party*, 238 A.3d at 368 n.23; *but see also Wetzel*, 120 F.4th at 211 (reaching contrary

conclusion based on flawed analysis); *Wetzel*, 2025 WL 917346, at *3 (Graves, J., dissenting from

denial of rehearing *en banc*); id. at *12 (Higginson, J., similar). As Justice Kavanaugh has

explained, allowing absentee ballots to "be mailed by election day" and received by some state-

law specified date thereafter is a "policy choice" left to the States. *DNC*, 141 S. Ct. at 34

48

(Kavanaugh, J., concurring). The President's desire to intrude upon this State "policy choice," *id.*, absent any contravening federal law, violates the vertical separation of powers and the Tenth Amendment.

145.    Plaintiffs have a cause of action against this violation of the separation of powers, *supra* ¶ 140, which injures them by restricting how Plaintiffs, their members, and their supporters can cast a ballot, which in turn imposes further organizational and competitive harms on Plaintiffs.

### COUNT IV

**Violation of the Separation of Powers – Usurpation of Congress's Spending Powers**
**(U.S. Const. art. I, § 8, cl. 1)**
**(Defendants Trump, Bondi, Noem, Hovland, Palmer, Hicks, McCormick, EOP, EAC, DHS, and DOJ)**

146.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

147.    Article I of the Constitution vests Congress with the power of the purse. The Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7, and the Spending Clause vests Congress with the power to expend Treasury funds for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

148.    Pursuant to these powers, Congress enacted the Help America Vote Act in 2002, which created the EAC to improve the administration of elections through funding, guidance, and policy development. Since 2018, the EAC has disbursed over $1 billion in grants to fund State initiatives to improve elections.

149.    Congress's power of the purse allows it to attach conditions on the receipt of federal funds through legislation. For example, Congress authorized the EAC to make "annual requirements payments" to each State that meets certain conditions, including filing a plan

describing how grant funds will be used to meet HAVA's requirements. *See* 52 U.S.C. §§ 21001, 21003. Congress also authorized the EAC to make grants to "assist entities in carrying out research and development to improve the quality, reliability, accuracy, accessibility, affordability, and security of voting equipment, election systems, and voting technology." *Id.* § 21041(a). But eligibility for such a grant is conditioned on "certifications that the research and development funded with the grant will take into account the need to make voting equipment fully accessible for individuals with disabilities." *Id.* § 21041(b)(1).

150.     In contrast, no provision of the Constitution purports to confer on the President or the Executive Branch any power to dictate government spending or to place conditions or limits on the spending power that is vested in the Legislative Branch. Rather, "[a]fter a bill becomes law, the President is required to 'take Care that the Law be faithfully executed.'" *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing U.S. Const. art. II, § 3, cl. 5). "Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." *Id.* Moreover, the President's obligation to execute the laws is "an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

151.     In spite of these well-established separation of powers principles, the Executive Order repeatedly seeks to condition the disbursement of federal funds on President Trump's preferred criteria, rather than anything set by Congress:

- Section 4(a) of the Executive Order directs the EAC to "cease providing Federal funds to States" that do not require documentary proof of United States citizenship—even though none of the statutes authorizing the EAC to provide federal funding to States condition such disbursements on requiring documentary proof of citizenship with a voter's registration. *See* E.O. § 4(a).

- Section 4(d) further orders the Secretary of Homeland Security and the Administrator of the Federal Emergency Management Agency to "heavily prioritize compliance with" the Executive Order's mandate that voting systems should provide a voter-verifiable paper record when providing funding for state or local elections. *See id*. § 4(d).

- Section 7(b) directs the EAC to "condition any available funding to a State on that State's compliance" with a "ballot receipt deadline of Election Day for all methods of voting." *See id.* § 7(b).

152.    Not one of these conditional spending provisions considers—let alone derives authority from—any applicable statutes or regulations authorizing the relevant federal agencies to disburse federal funds to State and local governments.

153.    By directing federal agencies to withhold and condition congressionally appropriated funds based on the President's own policy preferences, the Order attempts to amend or circumvent duly enacted federal statutes and appropriations. These actions exceed the President's Article II powers, abdicate his duty to take care that the laws be faithfully executed, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism and Presentment Clauses.

154.    Moreover, Congress *could not have* enacted statutes permitting the Executive Branch to condition federal funding on compliance with the Order because such statutes would exceed the constitutional limits on Congress's spending power.

155.    Congress's power to "attach conditions on the receipt of federal funds . . . is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987). The Supreme Court has articulated several general restrictions. Namely, the condition must be in pursuit of the general welfare; the condition must be unambiguous; the condition must be related to the federal interest in particular national projects or programs; the provision must not violate other constitutional provisions; and the condition must not be coercive. *Id.* at 207–08.

156.    The Order's conditional spending provisions violate every one of these principles.

157.    First, none of the relevant conditions advances the general welfare. Each condition will foreseeably disenfranchise eligible electors, which is incompatible with representative democracy.

158.    Second, there is no statute that requires these conditions at all, let alone one that does so "unambiguously." *Dole*, 483 U.S. at 207 (quotation omitted).

159.    Third, several of the conditions are not related to the funding they seek to revoke. By directing the EAC to withhold *all* federal funding to States that do not comply, the Order conditions funds entirely unrelated to voter registration on States' requirement of documentary proof of citizenship to register. *See* E.O. § 4(a). Similarly, it conditions the provision of *any* EAC funds, including those unrelated to mail voting or absentee voting, on States accepting the President's invented ballot receipt deadline. *See id.* § 7(b). Similarly, the Order threatens to withhold unspecified DOJ "grants and other funds" if States refuse to cooperate and investigate election crimes. *See id.* § 5(b). But the DOJ provides States with a variety of funding opportunities, including to assist victims of crime; to provide training and technical assistance; to conduct research; and to implement programs that improve the criminal, civil, and juvenile justice systems. Thus, the Order seeks to condition funds entirely unrelated to the prosecution of election crimes.

160.    Fourth, the conditions otherwise violate the Constitution because they are incompatible with the Tenth Amendment. *Supra* ¶¶ 142–45.

161.    Fifth, the Order attempts to coerce States into complying with the President's policy goals. The federal government may not "directly command[] a State to regulate or indirectly coerce[] a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578. Yet the Order would require the EAC to "cease" providing *any* federal funds to States that refuse to require

documentary proof of citizenship and further "condition" such funds' disbursement on compliance with an election day ballot receipt deadline. E.O. §§ 4(a), 7(b). States are heavily reliant on EAC grants to administer their elections—since 2018, the EAC has disbursed over $1 billion in grants—and so threatening that funding leaves States with no true choice.

162.    In other words, States must choose between acquiescing to the President's policy preferences and forgoing substantial sums of federal funds that enable them to maintain public safety and run efficient, safe, and secure elections. Such a threat "is much more than 'relatively mild encouragement'—it is a gun to the head." *NFIB*, 567 U.S. at 581.

163.    The Order's conditional spending provisions—which seek to punish States for refusing to acquiesce to the President's unlawful Order and to coerce them into implementing his policy preferences—harm Plaintiffs, their members, and their supporters, including by making it more difficult for them to register new voters across the country, and ensure all voters have meaningful access to registration and voting opportunities and safe, secure, and efficient elections.

### COUNT V

**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Contrary to the Election Day Statutes (2 U.S.C. § 7; 3 U.S.C. § 1)**
**(Defendants Trump, Bondi, Hovland, Palmer, Hicks, McCormick, EOP, EAC, DOJ)**

164.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

165.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

166.    Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks a right of action and even where the challenged action is directed by an order of the President. *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–19 (1979); *O.A.*

*v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177–

78 (D.D.C. 2020); *see also* Exec. Order No. 14215, *Ensuring Accountability for All Agencies*

(Feb. 18, 2025) (claiming authority to bind all federal agencies to the President's interpretations

of law).

167.    Section 7(a) of the Order requires the Attorney General to "take all necessary action

to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions," as the President

misinterprets them, by tabulating "absentee or mail-in ballots received after Election Day" for

federal elections pursuant to dozens of duly enacted state laws. E.O. § 7(a). But as the vast majority

of courts to consider the issue have concluded, nothing in those federal statutes speaks to when

ballots must be *received* in order to be counted for purposes of the federal election day. *See, e.g.*,

*Bognet*, 980 F.3d at 353–54; *Way*, 492 F. Supp. 3d at 369; *Bost*, 684 F. Supp. 3d at 735; *Boockvar*,

238 A.3d at 368 n.23; *see also Wetzel*, 2025 WL 917346, at *3 (Graves, J., dissenting from denial

of rehearing *en banc*); *id.* at *12 (Higginson, J., similar).

168.    Because these federal statutes are silent as to the time for ballot *receipt*, they in no

way preempt laws in the dozens of States that have adopted post-election day ballot receipt

deadlines. *See ITCA*, 570 U.S. at 9 (explaining Congress's preemption authority under the

Elections Clause extends "so far as it is exercised, and no farther"). Indeed, "ballot receipt deadline

statutes" have been "in place for many years in many states," but Congress has "never stepped in

and altered the rules." *Bost*, 684 F. Supp. 3d at 736. Moreover, the Election Day Statutes contain

no provision empowering the Attorney General to "enforce" them against the States. Accordingly,

any action by the Attorney General to "enforce" the Election Day Statutes against the States to

nullify duly enacted state ballot receipt deadline laws is "not in accordance with law," and is

54

"contrary to constitutional right[s] [and] power[s]" reserved to the States under the Election Clause. 5 U.S.C. § 706(2).

169.    The Order also requires the EAC to condition funding to States based on each State adopting the President's interpretation of "what constitutes a vote and what will be counted as a vote . . . as prescribed in 2 U.S.C. 7 and 3 U.S.C. 1," to create "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting." E.O. § 7(b). However, as explained, Congress has *not* enacted a federal ballot receipt deadline and the Election Day Statutes do not create one. Accordingly, conditioning funding to States based on a misreading of the Election Day Statutes, and in the absence of any other congressionally enacted federal ballot receipt deadline, is "not in accordance with law." 5 U.S.C. § 706(2).

170.    Plaintiffs, their members, and their supporters are harmed by these unlawful efforts to enforce the Election Day Statutes in a manner contrary to their text. Specifically, these efforts are intended to make—and will have the effect of making—it more difficult to effectively cast an absentee or mail-in ballot, methods of voting upon which many of Plaintiffs' members and supporters rely to exercise their right to vote.

## COUNT VI

**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Contrary to the National Voter Registration Act (52 U.S.C. § 20501, *et seq.*)**
**(Defendants Trump, Bondi, Hovland, Palmer, Hicks, McCormick, Hegseth, Collins,**
**Loeffler, Burgum, EOP, EAC, DOJ, DOD, VA, SBA, DOI)**

171.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

172.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion," "not in accordance with law," "contrary to

constitutional right, power, privilege, or immunity," or in "excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

173.    Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks a right of action and even where the challenged action is directed by an order of the President. *Supra* ¶ 166.

174.    Section 2(a)(i) of the Executive Order directs the EAC to prescribe a new "national mail voter registration form" that requires any person registering to vote using the form to provide "documentary proof of United States citizenship." E.O. § 2(a)(i). Any action taken by the EAC to carry out this directive violates the NVRA, and in turn the APA. The NVRA expressly states that the registration form prescribed by the EAC "may require *only* such identifying *information* (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. 20508(b)(1) (emphases added). And it specifies what minimum information is necessary to establish "citizenship": "the signature of the applicant, under penalty of perjury," attesting "that the applicant meets each such requirement." *Id.* 20508(b)(2). By requiring DPOC, which the NVRA nowhere mentions, Section 2(a) goes beyond the limits on the authorization prescribed by that statute in violation of the APA.

175.    Section 2(a) further violates the NVRA by overriding the act's prescribed procedure for *how* the EAC must promulgate the Federal Form: "in consultation with the chief election officers of the States." *Id*. § 20508(a)(2). While "a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," *ITCA*, 570 U.S. at 19, the NVRA does not contemplate the President unilaterally dictating the contents of the form,

much less extraneous additional requirements, to the EAC or state officials. To the contrary, the EAC's organic statute makes clear that the EAC is intended to be "an independent entity," 52 U.S.C. § 20921, led by a bipartisan commission of experts in the field of election administration, *id.* § 20923(a)-(c).

176.    Section 2(d) of the Executive Order provides that the "head of each Federal voter registration executive department or agency" under the NVRA "shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." E.O. § 2(d). As relevant, the NVRA defines certain federal agencies as "voter registration agencies" that "shall" provide the NVRA's Federal Form to all voters who receive services from those agencies. *See* 52 U.S.C. § 20506(a)(3)(B)(ii), (a)(4)(A). Various States have designated several federal agency offices as voter registration agencies under the NVRA, including offices supervised by DOD, VA, SBA, and DOI.

177.    The NVRA is clear that such federal voter registration agencies "*shall* . . . ma[k]e available . . . (i) Distribution of mail voter registration application forms," "[a]ssist[] applicants in completing voter registration application forms, unless the application refuses such assistance," and "[a]ccept[] . . . completed voter registration application forms for transmittal to the appropriate State election official." *Id.* § 20506(a)(4)(A)(i)-(iii); *see also id.* § 20506(a)(6) (similar). Nothing in the NVRA conditions this mandatory provision of the Federal Form on a requirement that voter registration agencies or their heads "assess" the citizenship or other qualifications of voters who receive their assistance—a task many such agencies lack any capacity or expertise to perform. *See id.* That is why the NVRA requires voter registration agencies to "accept[]" such forms for "transmit[al] to the appropriate State election official." *Id.* § 20506(a)(4)(iii). By taking action

57

contrary to the NVRA and that goes beyond the limits on the authorization prescribed by that statute, Defendants are in violation of the APA.

178.    Each of these violations harms Plaintiffs, their members, and their supporters by restricting the means by which voters can register to vote, and by undermining critical assistance for voters who require help in doing so. Indeed, the unlawful actions directed by the Order undermine the NVRA's very purpose of ensuring that all eligible voters can access the franchise. Many will be unable to, or will be discouraged from, exercising their fundamental right to vote as a result, while others will face significant new barriers, inflicting direct harm on Plaintiffs' investments in core programs that aim to maximize registration and turnout among members and supporters.

## COUNT VII

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to UOCAVA (52 U.S.C. § 20301, *et seq.*)
### (Defendants Trump, EOP, Hegseth, DOD)

179.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

180.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion," "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or in "excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

181.    Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks an applicable right of action, and even where the challenged action is directed by an order of the President. *Supra* ¶ 166.

182.    Section 3(d) of the Executive Order orders the Secretary of Defense to "update the Federal Post Card Application" pursuant to UOCAVA to require "documentary proof of United

States citizenship" as well as "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." E.O. § 3(d). Any such actions taken by the Secretary of Defense or Department of Defense violate the APA: UOCAVA does not permit or contemplate the addition of any requirements beyond what voters place on the "post card."

183.    UOCAVA, in relevant part, requires the Secretary to "prescribe an official *post card form*, containing both an absentee voter registration application and an absentee ballot application, for use" by military and other overseas voters when seeking to vote in their home state. 52 U.S.C. § 20301(b)(2) (emphasis added). The statute in turn requires States to accept that form. *Id.* § 20302(a)(4). Other aspects of UOCAVA confirm that the direction to promulgate a "post card form" does not include authority to impose extraneous requirements: the Secretary is required to prescribe an oath for the form that takes the place of any other verification required under state law, *id.* § 20302(a)(5), and the law prohibits States from rejecting an application based on certain issues outside of the form, *id.* § 20302(i).

184.    By taking action contrary to UOCAVA and that goes beyond the limits on the authorization prescribed by that statute, Defendants are in violation of the APA.

185.    This violation harms Plaintiffs, their members, and their supporters by restricting the means by which military and overseas voters can register and vote. E.O. 14248's directive, in fact, undermines UOCAVA's express purpose of ensuring that all eligible voters overseas may easily access the franchise. Many will be unable to satisfy the requirement because of their circumstances, while others will be forced to comply with a significant new barrier each time they seek to exercise their fundamental right to vote in a federal election. This violation thus also inflicts direct harm on Plaintiffs' investments in core programs that aim to maximize registration and turnout among their members and supporters—including those living abroad—and requires

Plaintiffs to invest additional funds in efforts to ensure that their members and supporters abroad are able to register and vote in each federal election.

## COUNT VIII

**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Agency Action Contrary to the Fifth Amendment (U.S. Const., art. V)**
**(Defendants Trump, Hegseth, Collins, Loeffler, Burgum, EOPDOD, VA, SBA, DOI)**

186.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

187.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion," "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or in "excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

188.    The Fifth Amendment to the U.S. Constitution guarantees equal protection of the laws. *Bolling v. Sharpe*, 347 U.S. 497, 498–500 (1954). A law or regulation violates equal protection when it creates a classification that lacks a rational relationship to a legitimate government interest. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973).

189.    State and federal agencies designated under the NVRA as "voter registration agencies" must, among other things, distribute voter registration forms, assist people with completing them, and accept the completed forms for transmittal to the appropriate State election officials. 52 U.S.C. § 20506(a)(4)(A).

190.    The Order places new obligations on "[t]he head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. 20506(a)." E.O. § 2(d). Even though the NVRA defines certain federal agencies as "voter registration agencies" that "shall" provide the Federal Form to all voters who receive services from those agencies, *see* 52 U.S.C. § 20506(a)(3)(B)(ii), (a)(4)(A), President Trump's Order requires

60

federal agency heads to "assess citizenship *prior to* providing a Federal voter registration form to enrollees of public assistance programs." *See* E.O. § 2(d) (emphasis added). Nowhere does the Order explain what it means for these officials to "assess" citizenship or even whether and how relevant federal officials *can* reliably "assess" citizenship.

191.    Most importantly, this provision targets only "enrollees of public assistance programs" for extra citizenship review; under the Order, no other class of individuals are subject to such checks. *See id*. Only recipients of public assistance are singled out for this added level of vague, arbitrary, and unreliable "assess[ment]" of their citizenship prior to even receiving a Federal Form.

192.    Various States have designated several federal agency offices as federal voter registration agencies, including offices supervised by DOD, VA, SBA, and DOI.

193.    Any action taken by Defendants to carry out this directive violates the Fifth Amendment. There is no conceivable, let alone rational, basis for imposing citizenship assessments only on individuals enrolled in public assistance programs before they can even receive a voter registration form. "Voter qualifications have no relation to wealth," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966), and subjecting only individuals enrolled in public assistance programs to this assessment is irrelevant to the Order's stated interest in "enforce[ing] the Federal prohibition on foreign nationals voting in Federal elections," E.O. § 2; s*ee Moreno*, 413 U.S. at 534 (finding no rational basis for a challenged classification that was "clearly irrelevant to the stated purposes of the Act").

194.    As explained *supra* IV.B, Plaintiffs, their members, and their supporters are harmed by the Order's unlawful imposition of a DPOC requirement for the Federal Form.

# COUNT IX

## Administrative Procedure Act, 5 U.S.C. § 706(2)
## Agency Action Contrary to the Privacy Act (5 U.S.C. § 552a)
## (Defendants Gleason, Trump, Noem, Rubio, Deduk, EOP, DOGE, DHS, DOS, SSA)

195.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

196.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion," "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or in "excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

197.    Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks an applicable right of action, and even where the challenged action is directed by an order of the President. *Supra* ¶ 166.

198.    The Privacy Act erects robust protections for personal data by sharply restricting federal agencies from disseminating individuals' information without consent.

199.    Specifically, the Privacy Act prohibits federal agencies and officers from disclosing "*any* record which is contained in a system of records by *any* means of communication to *any* person, *or to another agency*, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific limited circumstances, none of which is present here. 5 U.S.C. § 552a(b) (emphasis added). A record, in turn, includes "any item, collection, or grouping of information about an individual" that includes identifying information and is maintained by an agency. *See id.* § 552a(a)(4).

200.    This prohibition includes granting access to databases containing personal information to individuals who are not authorized by law to access or use the information. *See*

*Wilkerson v. Shinseki*, 606 F.3d 1256, 1268 (10th Cir. 2010); *see also Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010).

201.    Plaintiffs are entitled to declaratory and injunctive relief under the Privacy Act when they establish two elements: (1) the information is a record within a system of records, and (2) the agency improperly disclosed the information. *Fisher v. Nat'l Institutes of Health*, 934 F. Supp. 464, 468 (D.D.C.), *aff'd*, 107 F.3d 922 (D.C. Cir. 1996).

202.    Multiple parts of the Executive Order direct federal agencies and officers to grant unauthorized third parties access to systems and databases containing personal information of voters, including Plaintiffs, Plaintiffs' members, and Plaintiffs' supporters, without consent.

- Section 2(b)(i) of the Executive Order directs the Secretary of Homeland Security to "ensure that State and local officials have . . . access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered," E.O. § 2(b)(i);

- Section 2(b)(ii) of the Executive Order directs the Secretary of State to "make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered," *id.* § 2(b)(ii);

- Section 2(b)(iii) of the Executive Order directs the Department of Homeland Security to grant the "DOGE Administrator" access to, among other things, "Federal immigration databases" as part of efforts to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," *id.* § 2(b)(iii); and

- Section 3(a) of the Executive Order directs the "Commissioner of Social Security [to] take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered," *id.* § 3(a).

203.    A record kept in a database or system maintained by DHS, DOS, or the SSA that provides information about "individuals" pertaining to their "citizenship" or "eligibility" is necessarily a "record . . . contained in a system of records." 5 U.S.C. § 552a(b). Such records

cannot be lawfully accessed by Defendants without the consent of the individuals to whom the record pertains. Upon information and belief, these nonconsensual disclosures of records have taken place or will imminently take place. By taking action contrary to the Privacy Act, Defendants are in violation of the APA.

204.    Each of these violations inflicts direct and irreparable harm on Plaintiffs, their members, and their supporters by disclosing personal information, on a mass basis, to unauthorized entities and individuals. *See Garey*, 35 F.4th at 919–20; *see also, e.g.*, *Randolph*, 973 A.2d at 710. Further, the Order is clear that these unlawful disclosures are being made for the purpose of investigating and taking further action against voters who are already registered (and thus already proved their qualifications). Yet matching information contained in federal databases to voter registration data is an extremely error-prone endeavor for several reasons, not the least because federal databases are often not "up to date." *Mi Familia Vota*, 129 F.4th at 705. The risk of erroneous identification, investigation, and improper removal from voter rolls by state officials only compounds the harm resulting from unlawful disclosure.

## COUNT X

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to the First and Fifth Amendments (U.S. Const., arts. I, V)
### (Defendants Trump, Hegseth, Hovland, Palmer, Hicks, McCormick, EOP, DOD, EAC)

205.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

206.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), along with agency action that is "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B).

207.    The Supreme Court has long recognized that constitutional principles of free speech, free association, equal protection, and due process establish a federal constitutional right to vote free from excessive burdens. *See, e.g., Anderson*, 460 U.S. at 793; *Burdick*, 504 U.S. at 433. In evaluating the constitutionality of an election regulation, courts weigh "the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 793). Where an election regulation "impos[es] severe burdens on plaintiffs' rights" it "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Even more modest burdens "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotations marks omitted).

208.    The Executive Order unlawfully burdens the right to vote by purporting to condition registration using the Federal Form on the provision of limited forms of DPOC. *See* E.O. § 2(a)(i). At least 21.3 million—nearly 9 percent of American citizens of voting age—lack access to documentation necessary to prove citizenship. The number of American citizens of voting age impacted by the Order is likely far greater, as it excludes certain forms of DPOC like a birth certificate issued by a State, adoption certificates, Consular Reports of Birth Abroad issued by the Secretary of State, naturalization documents issued by DHS, and an American Indian Card issued by DHS indicating citizenship. *See id.* § 2(a)(ii). The Order imposes a similar burden on military and overseas voters who seek to register to vote using the UOCAVA Federal Post Card Application. *See id.* § 3(d).

209.    Such a requirement imposes a severe burden on the right to vote, effectively barring tens of millions of Americans from registering using the Federal Form even though courts have found that non-citizen voting is exceedingly rare. *E.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 966–67 (D. Ariz. 2024). When Kansas briefly implemented a similar DPOC requirement, approximately 12 percent of all registrants—tens of thousands of voters—had their applications rejected, even though it was undisputed that nearly all of them were U.S. citizens. *See Fish*, 957 F.3d at 1128. Similar trends have emerged elsewhere: in New Hampshire, a new DPOC requirement disenfranchised dozens of voters in a single set of town elections in March 2025 and imposed significant burdens on dozens more—disproportionately affecting women who had changed their legal name after marriage. *Supra* ¶ 112.

210.    The Order's DPOC requirement is in no way narrowly tailored to advance a compelling governmental interest. The NVRA already establishes how a voter affirms their citizenship for purposes of establishing their qualification to vote. *See* 52 U.S.C. § 20508(b)(2)(A) (requiring Federal Form applicants to affirm citizenship under penalty of perjury). Nothing in the President's Executive Order explains how this existing, statutory requirement for affirming citizenship fails to serve governmental interests in establishing an applicant's qualification to vote.

211.    Even if the DPOC requirement did not impose a severe burden—and it plainly does on the millions of American citizens who have no ability to comply with it—it would not survive more modest scrutiny because the NVRA already conclusively resolves how a citizen establishes their citizenship. *See id*. The DPOC requirement therefore serves no valid interest save to burden voters.

212.    As explained *supra* IV.B, Plaintiffs, their members, and their supporters are harmed by the Order's unlawful imposition of a DPOC requirement for the Federal Form.

## COUNT XI

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Agency Action Contrary to the Help America Vote Act (52 U.S.C. § 20921, *et seq.*)
### (Defendants Trump, EOP, Hovland, Palmer, Hicks, McCormick, EAC)

213.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

214.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

215.    Review of agency action for compliance with a federal statute is available under the APA, even where the statute lacks an applicable right of action, and even where the challenged action is directed by an order of the President. *Supra* ¶ 166.

216.    The Order purports to require the EAC to undertake numerous acts that are "not in accordance with law" under the Help America Vote Act, which creates the EAC and establishes its duties, powers, and procedures. *See* 52 U.S.C. § 20921, *et seq.*

217.    The EAC's organic statute states that the agency shall be an "independent entity." *Id*. To that end, Congress designed the agency to be led by a four-member Commission, comprised of experts in the field of election administration, with no more than two members belonging to the same political party. *See id.* § 20923(a)-(b). And it further chose to require that the EAC may act "only with the approval of at least three of its members." *Id.* § 20928.

67

218.    The Order serially requires that the EAC engage in agency action dictated by the President notwithstanding these mandatory procedural safeguards. *See* E.O. §§ 2(a), 4(a)-(c), 7(b).[26] For example, the Order commands the EAC to:

- Reach a pre-determined conclusion about how to amend the Federal Form, namely by adding the President's preferred DPOC requirement, *id*. § 2(a);

- Cease providing federal funds to States that do not accept the President's mandated changes to the Federal Form, *id*. § 4(a);

- Amend the Voluntary Voting System Guidelines 2.0 according to the President's conclusion about best practices for voting systems, *id*. § 4(b)(i);

- Re-certify voting systems under the President's preferred standards for voting systems, *id.* § 4(b)(ii);

- Audit HAVA fund expenditures and report any alleged "discrepancies" to DOJ, *id.* § 4(c); and

- Condition federal funding to States based on their acquiescence to the President's imposition of his own preferred ballot receipt deadline, *id.* § 7(b).

219.    Such agency actions are not in accordance with HAVA and thus violate the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court exercise its equitable authority to grant the following relief:

A.    Declare that the President's orders in E.O. §§ 2(a), 2(b)(iii), 2(d), 4(a), 4(b), 4(c), 7(a), and 7(b) are *ultra vires* and legally void;

B.    Declare that the President's orders in E.O. §§ 2(a), 4(a), 4(b), 4(c), 4(d), and 7(b) violate the constitutional separation of powers and are not enforceable;

C.    Declare that the President's order in E.O. § 7(a) violates the vertical separation of

---

[26] The President has elsewhere made clear his position that the EAC *must* obey his instructions, notwithstanding these statutory safeguards. *See* Exec. Order No. 14215, § 7, *Ensuring Accountability for All Agencies* (Feb. 18, 2025), https://perma.cc/7TNT-UX2B (forbidding all agency officials from "advanc[ing] an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law").

powers and the Tenth Amendment to the U.S. Constitution and are not enforceable;

D. Declare that E.O. §§ 2(a), 2(b), 2(d), 3(a), 3(d), 4(a), 4(b), 4(c), 7(a), and 7(b) violate the Administrative Procedure Act and are "not in accordance with law" and are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B)-(C);

E. Preliminarily and permanently enjoin the EAC and its Commissioners from taking any action to implement E.O. §§ 2(a), 4(a), 4(b), 4(c), and 7(b);

F. Preliminarily and permanently enjoin the Attorney General and Department of Justice from taking any action to implement E.O. § 7(a);

G. Preliminarily and permanently enjoin the Secretary of State and Department of State from taking any action to implement E.O. § 2(b)(ii);

H. Preliminarily and permanently enjoin the Secretary of Homeland Security and DHS from taking any action to implement E.O. §§ 2(b) and 4(d);

I. Preliminarily and permanently enjoin the DOGE Administrator and DOGE from taking any action to implement E.O. § 2(b)(iii);

J. Preliminarily and permanently enjoin the SSA Administrator and SSA from taking any action to implement E.O. § 3(a);

K. Preliminarily and permanently enjoin the Secretary of Defense and DOD from taking any action to implement E.O. §§ 2(d) and 3(d);

L. Preliminarily and permanently enjoin the Secretary of Veterans Affairs and the VA; the Administrator of SBA and SBA; and the Secretary of the Interior and DOI from taking any action to implement E.O. § 2(d);

M. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

N. Grant such other relief as the Court deems just and proper.

69

Dated: March 31, 2025

Respectfully submitted,

/s/     *Aria C. Branch*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Aria C. Branch (DC 1014541)
Lalitha D. Madduri (DC 1659412)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
James J. Pinchak (NY 5965397)*
Julie Zuckerbrod (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177

*\*Pro hac vice application forthcoming*

*Counsel for Plaintiffs Democratic National Committee, DGA, DSCC, DCCC, Senate Minority Leader Schumer, and House Minority Leader Jeffries*